# UNITED STATES of America

### v.

### Reynaldo LIBORO, Appellant.

### Nos. 91–3066, 92–3240.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 25, 1993.

Decided Dec. 14, 1993.

A.J. Kramer, Washington, DC, argued the cause and filed the briefs for appellant.

Daniel M. Zachem, Asst. U.S. Atty., Washington, DC, argued the cause for appellee. With him on the briefs were Jay B. Stephens, U.S. Atty. at the time the brief was filed, John R. Fisher, and Elizabeth Trosman, Asst. U.S. Attys.

Before: SILBERMAN and RANDOLPH, Circuit Judges, and COFFIN *, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Reynaldo Liboro appeals from a judgment of conviction entered upon his plea of guilty to an Information charging him with one count of bank fraud, in violation of 18 U.S.C. § 1344 (1988),[1] and one count of first degree

---

\* Of the United States Court of Appeals for the First Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. As it read at the time of the offense, 18 U.S.C. § 1344 (1988) provided, in pertinent part:

(a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—

    (1) to defraud a federally chartered or insured financial institution; or

    (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, repre-

theft, in violation of D.C.Code §§ 22–3811 & 22–3812(a).[2] Liboro's main argument is that Judge Harris neglected to inform him of the nature of the charges, as Rule 11(c)(1), Fed. R.Crim.P., requires before a district court may accept a guilty plea.

Liboro served as the financial officer of the law firm of Dickstein, Shapiro and Morin. As comptroller, he had the authority to issue checks drawn on the firm's account at the National Bank of Washington and to cash checks for the firm or its members at that bank and at a branch of the American Security Bank. He also maintained the firm's financial records. From July 1979 until February 1988, so the Information charged, Liboro used his position to steal approximately $1.3 million of Dickstein, Shapiro's funds.

The following description of how Liboro pulled off this scheme is taken from the prosecutor's summary of the government's evidence, made in open court during the Rule 11 proceedings on November 7, 1990:

> The checking account for the law firm was with the National Bank of Washington; and as a result of that relationship, [the firm's] employees had a particularized relationship with that bank:
>
> The firm also had an ongoing business relationship with a branch of American Security Bank, as the bank was located in the same building as the law firm in the lobby; and many employees of the firm regularly did business at that particular branch.
>
> In 1988, a discrepancy in the books of the law firm was discovered. Mr. Liboro was questioned concerning these records, and his responses were not satisfactory.

> A further check revealed several suspicious checks issued by the law firm. These checks were made payable to one of the partners of the firm, but the endorsement also bore on the back of the check the defendant's signature.
>
> The partner in question indicated that he had not endorsed the check and had not authorized the defendant or anyone else to do so.
>
> The partner indicated that he had not received the proceeds of that check.
>
> On February 17th, 1988, the defendant was questioned about these checks, and he was again unable to provide an explanation. Mr. Liboro was terminated immediately.
>
> The day after the discovery of this theft, Mr. Liboro had his wife, Elizabeth Valderama Liboro, withdraw $50,000 for him from one of their joint accounts.
>
> On that same day, he fled to the Philippines.
>
> A detailed audit was then conducted by the law firm and an extensive scheme to defraud was discovered, which spans virtually the defendant's entire period of employment with the firm.
>
> From at least as early as July 1979 until February 1988 and including the dates alleged in the information, the superseding information filed with the court, the defendant systematically stole from the law firm money which totaled approximately $1.3 million.
>
> The defendant accomplished this fraud by several methods. He authorized the issuance of checks from the firm's account

---

sentations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

2.    (a) For the purpose of this section, the term "wrongfully obtains or uses" means: (1) Taking or exercising control over property; (2) making an unauthorized use, disposition, or transfer of an interest in or possession of property; or (3) obtaining property by trick, false pretense, false token, tampering, or deception. The term "wrongfully obtains or uses" includes conduct previously known as larceny, larceny by trick, larceny by trust, embezzlement, and false pretenses.

(b) A person commits the offense of theft if that person wrongfully obtains or uses the property of another with intent:

(1) To deprive the other of a right to the property or a benefit of the property; or

(2) To appropriate the property to his or her own use or to the use of a third person.

D.C.Code § 22–3811.

(a) *Theft in the 1st degree* —Any person convicted of theft shall be fined not more than $5,000 or imprisoned for not more than 10 years, or both, if the value of the property obtained or used is $250 or more.

D.C.Code § 22–3812(a).

for fictitious payees for expenses or costs not actually incurred by the firm.

He authorized the issuance of checks from the firm's account, which were made payable to actual service providers of the firm, people who they normally did business with, but for obligations which were not owed by the firm.

He authorized the issuance of checks from the firm's account which were made payable to actual clients of the firm for disbursements which were not, in fact, owed to them.

All of these falsified checks the defendant received himself. The defendant would create, if necessary, false internal check authorization forms, the froms [sic] that were generated by a check and balance measure within the law firm, to justify the issuance of these checks.

The defendant also, as part of the scheme, failed to disburse to authorized payees checks which were properly issued as part of the partnership draw disbursements for the firm. He maintained [sic] some of those checks as well.

On all of these fraudulently obtained checks, the defendant would then forge the endorsement of the payees. He cashed these forged checks at one of two banks—either at a branch of the National Bank of Washington or at a branch of American Security Bank, both of which were federally-insured financial institutions in the District of Columbia.

He would represent when he presented these checks, in presenting them, that he was authorized to negotiate those checks for the payee.

The defendant also solicited other employees of the law firm to cash these forged checks for him at these two branches of the banks—National Bank of Washington and American Security Bank in the District.

These employees were not aware that the checks had been forged. They turned over the proceeds of the checks to the defendant and they did so based on [the] defendant's position at the firm.

The defendant also falsified entries in the financial records of the firm to cover these expenditures.

The defendant took the cash he received from this fraud and routinely gave [the] cash to his wife.

His wife made regular cash deposits in their joint account and [a] joint account she held with her parents.

The Liboros, the evidence would show, used the proceeds of this fraud to, among other things, invest in real estate in the D.C. area, including their home in Virginia, to do home improvements on their home and [to do] interior decorating.

They also used the proceeds of the theft to purchase three luxury cars, jewelry, and a fur coat.

The defendant also surreptitiously took cash to the Philippines as part of the scheme to defraud.

The law firm has identified over 400 checks which were forged. The dollar loss that the law firm estimates it sustained as [a] result of the theft during the entire length of the scheme totaled $1,335,442.89.

▮ Earlier in the proceeding, Liboro's retained counsel had submitted a written form to the court, signed by the defendant and the attorney, stating that:

I, Reynaldo Liboro, the above named defendant, who is accused of

Bank Fraud—18 USC 1344

Theft I—22 DC Code 3811, 3812(a)

being advised of the nature of the charges, the proposed information, and of my rights, hereby waive in open court on Nov. 7, 1990 prosecution by indictment and consent that the proceeding may be by information rather than by indictment.

The form complied with Rule 7(b), Fed. R.Crim.P., which is set forth in the margin.[3]

---

**3.** (b) **Waiver of Indictment.** An offense which may be punished by imprisonment for a term exceeding one year or at hard labor may be prosecuted by information if the defendant, after having been advised of the nature of the charge and of the rights of the defendant, waives in open court prosecution by indictment.

Liboro contends that the district court failed to comply with this rule, and that this somehow

Upon finding Liboro competent to enter a plea, Judge Harris personally addressed the defendant, asking him whether he had had "an ample opportunity to discuss your case with your attorney" (he said yes); whether he was satisfied with his attorney's representation (he was); whether he understood that he had a right to a jury trial (he did); whether he knew that if he went to trial the government would present witnesses and his attorney could cross-examine them and offer evidence on his behalf (he knew this); whether he realized that he could testify at such a trial but had the right to remain silent (he did); whether he understood that if the court accepted his plea, he would be waiving these rights (yes); whether if he pleaded guilty he would have to acknowledge his guilt (yes); and whether having been informed of all this he still wanted to plead guilty (yes). Liboro understood the maximum penalties under the federal and local statutes he was charged with violating. He denied having been threatened or coerced into entering a guilty plea or having been promised any particular sentence. He understood and agreed with the plea agreement, under which he would not be prosecuted for any other offenses arising out of his theft of the $1.3 million.

When the prosecutor finished describing the offenses in the statement quoted above, Judge Harris asked Liboro "are you essentially in agreement with what the prosecutor said happened in your case?" Liboro, who had been duly sworn, answered "Yes, I am, your honor." Judge Harris found the guilty plea acceptable, directed its entry and, at a later hearing, sentenced Liboro to five years' imprisonment for bank fraud, to be followed by a consecutive three to nine year term of imprisonment for theft.

Liboro claims the judge did not inform him of "the nature of the charge to which the plea is offered." Rule 11(c)(1). The government

meets this oddly, urging us to treat the case as if it were a collateral attack brought under 28 U.S.C. § 2255, in which event Liboro would have to show considerably more than simply a violation of Rule 11. *See United States v. Timmreck*, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979). The rub, of course, is with the "as if." Liboro is in fact bringing a direct appeal from the judgment of conviction. We perceive no legal reason for pretending it is something else. His appeal took time getting here, perhaps as long as some § 2255 attacks, but it remains a direct appeal nonetheless.

■ The government's other response is that whatever error occurred was harmless under Rule 11(h),[4] a provision added in 1983 as a delayed response to *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). The point, well-taken we believe, is that Liboro was sufficiently apprised of the charges and comprehended them. The prosecutor's narrative during the November 1990 plea proceeding was direct and precise in its depiction of the offenses. Liboro, of all people, could and did understand what he had done. Under oath, he told Judge Harris that he agreed with the prosecutor's statement, thereby signifying that he understood the charges the prosecutor described. Unlike *United States v. Ford*, 993 F.2d 249, 253 (D.C.Cir.1993), there was no confusion about the charges to which Liboro was pleading. Furthermore, he and his attorney signed a statement attesting to the fact that the "nature of the charges" had been explained to him. *See supra* note 3. He expressed satisfaction with his attorney. His ability to comprehend is not open to doubt. Liboro held a responsible position requiring considerable sophistication. At sentencing his attorney told the court that

---

exacerbated the alleged Rule 11(c)(1) violation. Rule 7(b) does not, by its terms, require the court to do anything. The defendant's waiver of indictment must of course be knowing and voluntary. But there is no reason why the requisite advice to the defendant cannot come from the usual source—his attorney. By affixing his signature to the waiver, Liboro's attorney assured the court that he had performed his duty of advising his client. *See Henderson v. Morgan*,

426 U.S. 637, 647, 96 S.Ct. 2253, 2258, 49 L.Ed.2d 108 (1976).

4. This states:

 **(h) Harmless Error.** Any variance from the procedures required by this rule which does not affect substantial rights shall be disregarded.

Fed.R.Crim.P. 11(h).

Liboro held a four-year degree in business administration.

█ In evaluating whether an alleged error is harmless, it is of course useful to identify the error with some precision. The government, in its Brief, admitted generally that the district court failed to inform Liboro of the nature of the charges, as Rule 11(c)(1) required. At oral argument, much of the discussion about what the district court should have told Liboro concerned the court's failure to spell out the elements of the offenses. Rule 11(c)(1), however, lays down no rigid rule on this subject. "The contention that even in ... circumstances [like this case] the judge must deliver to the defendant the equivalent of a jury charge finds no support in the language of the Rule and runs counter to the legislative history." *United States v. Saft*, 558 F.2d 1073, 1079 (2d Cir. 1977) (Friendly, J.). "There is no requirement that the 'elements' of the offense be explained." *United States v. Lowe*, 367 F.2d 44, 45 (7th Cir.1966); *see Sober v. Crist*, 644 F.2d 807, 809 (9th Cir.1981); *United States v. Bambulas*, 571 F.2d 525, 527 (10th Cir.1978) (per curiam). What the defendant must understand is the "nature" of the charge, its substance. *Lowe*, 367 F.2d at 45; *cf. Henderson v. Morgan*, 426 U.S. 637, 647 n. 18, 96 S.Ct. 2253, 2258 n. 18, 49 L.Ed.2d 108 (1976). While the court may thus need to explain the elements of an offense when the charges "incorporat[e] esoteric terms or concepts unfamiliar to the lay mind," *United States v. Dayton*, 604 F.2d 931, 938 (5th Cir.1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980), the charges against Liboro were not of that sort. With his education and sophistication, with his counsel at his side throughout the plea negotiations and proceedings, with the government's case spread before him, Liboro surely knew that his taking $1.3 million belonging to someone else was theft and that his forging of checks to obtain the firm's money in the custody of a bank constituted bank fraud. *See supra* notes 1 & 2. For a sample of similar cases, *see United States v. Musa*, 946 F.2d 1297, 1304 (7th Cir.1991); *United States v. Gomez–Cuevas*, 917 F.2d 1521, 1525 (10th Cir.1990); *United States v. Reckmeyer*, 786 F.2d 1216, 1221 (4th Cir.),

*cert. denied*, 479 U.S. 850, 107 S.Ct. 177, 93 L.Ed.2d 113 (1986); *United States v. Nieuwsma*, 779 F.2d 1359, 1361–62 (8th Cir. 1985); *United States v. Bell*, 776 F.2d 965, 968–71 (11th Cir.1985), *cert. denied*, 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986).

It is true that during the proceedings Liboro heard about the facts underlying the charges from the prosecutor, whereas Rule 11(c)(1) makes it the court's responsibility to inform the defendant of the nature of the charges. Nevertheless, the Seventh Circuit has held that the court may "rely on a prosecutor to describe the nature of the charge," *United States v. Cusenza*, 749 F.2d 473, 476 n. 1 (1984), citing *United States v. Gray*, 611 F.2d 194, 199 (7th Cir.1979), *cert. denied*, 446 U.S. 911, 100 S.Ct. 1840, 64 L.Ed.2d 264 (1980); *see also United States v. Musa*, 946 F.2d at 1304. Our decision in *Ford*, 993 F.2d at 253, however, points in the opposite direction. At any rate, the prosecutor's statement here closely tracked the Information. If the court, or the clerk, had read the Information to Liboro, or if Judge Harris had personally spelled out the substance of the theft and bank fraud charges, Liboro would have heard virtually the same thing twice. The Advisory Committee Notes to the 1983 amendment of Rule 11 rightly frown upon a trial judge's "totally abdicat[ing] to the prosecutor the responsibility for giving to the defendant the various Rule 11 warnings." But we are concerned here with only one of Rule 11's many "warnings" and Judge Harris' question to the defendant at the close of the prosecutor's statement shows that the court did not "totally abdicate" its responsibility. The district court's deviation from Rule 11(c)(1)'s requirement that the court personally address the defendant was harmless under Rule 11(h). Liboro does not argue that he misunderstood the charges. He does not claim that he pleaded guilty to crimes he did not commit. He does not even suggest that if the court, in addition to the prosecutor, had described the charges he would not have pleaded guilty. His attorney at the time interposed no objection to the manner in which the court conducted the plea proceedings, *see* Rule 52(b), Fed. R.Crim.P., although had he done so the de-

fect now identified could easily have been averted. From all that appears, Liboro's plea was knowing and voluntary and, as we have indicated, the miscue he identifies had no prejudicial effect.

It has been said that Rule 11 commands no set ritual; it has also been said that mere ritualistic compliance with the rule will not always suffice. *See McCarthy v. United States*, 394 U.S. at 467 n. 20, 89 S.Ct. at 1171 n. 20; 1 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 172, at 583 (2d ed. 1982 & Supp.1993). Still, issues like those raised in this case could be avoided if district judges framed their Rule 11 inquiries and gave their Rule 11 advice to defendants in terms closely following those in the rule. It is worth remembering that minor variations can have major consequences.

*Affirmed.*