

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-14-2000

# United States v. Cefaratti

Precedential or Non-Precedential:

Docket 99-3455

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Cefaratti" (2000). *2000 Decisions.* Paper 164.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/164

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 14, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3455

UNITED STATES OF AMERICA

v.

FRANK CEFARATTI,
        Appellant

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 98-cr-00212)
District Judge: Honorable Sylvia H. Rambo

Argued February 9, 2000

BEFORE: SLOVITER, SCIRICA, and McKEE,
Circuit Judges

(Filed: August 14, 2000)

        Joshua D. Lock
        Goldberg, Katzman & Shipman
        Harrisburg, PA 17108

        Peter Goldberger (Argued)
        James H. Feldman, Jr.
        Pamela A. Wilk
        Law Office of Peter Goldberger
        Ardmore, PA 19003-2276

         Attorneys for Appellant

David M. Barasch
 United States Attorney
Sally A. Lied
Theodore B. Smith, III (Argued)
 Assistant United States Attorney
Office of United States Attorney
Harrisburg, PA 17108

 Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Frank Cefaratti, who pleaded guilty to four counts arising from his execution of a scheme to defraud the United States Department of Education (DOE) out of student financial assistance funds, now appeals, arguing that the District Court erred in accepting his plea to the count charging him with engaging in monetary transactions in the proceeds of specified unlawful activity in violation of 18 U.S.C. S 1957. He also challenges his sentence of 51 months imprisonment.

I.

BACKGROUND

A.

Procedural History

On September 8, 1998, a grand jury returned a 27-count indictment against Cefaratti charging him as follows: Counts I through XX with mail fraud in violation of 18 U.S.C. S 1341, Counts XXI and XXII with wire fraud in violation of 18 U.S.C. S 1343, Count XXIII with fraudulently obtaining student financial aid funds in violation of 20 U.S.C. S 1097(a), Count XXIV with conducting a series of financial transactions in violation of 18 U.S.C.

2

S 1956(a)(1)(A)(i) and S 1956(a)(1)(B)(i), and Counts XXV through XXVII with offenses relating to obstruction of justice in violation of 18 U.S.C. S 1512(b)(1), 18 U.S.C. S 1503, and 18 U.S.C. S 2232(a), respectively.

At his arraignment on September 25, 1998, Cefaratti pleaded not guilty and was released after executing an unsecured bond. Thereafter, he entered into a plea agreement with the government, filed on October 28, 1998, to plead guilty to Count IV, one of the mail fraud counts, to Count XXIII, the student loan fraud count, and to Count XXVII, charging destruction of property to prevent seizure.[1] Cefaratti also agreed to waive indictment and plead guilty to a superseding information charging him with engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. S 1957(a). The S 1957 charge is of a lesser offense than theS 1956 charge in the original indictment, as conviction of S 1957 carries a maximum sentence of ten years imprisonment instead of the twenty years maximum for S 1956. In return the government agreed, inter alia, to move for dismissal of the remaining counts, bring no further charges (other than criminal tax charges) related to Cefaratti's offense conduct, recommend a sentence within the applicable guideline range, and, if Cefaratti adequately demonstrated his acceptance of responsibility, recommend a three-point reduction on that basis.

Cefaratti entered his guilty plea at a hearing on October 30, 1998. The presentence report (PSR) calculated a total offense level of 24 and, based on Cefaratti's criminal history category of I, set the applicable guideline range of 51 to 63 months. Cefaratti objected to the PSR on two grounds: that the report erroneously applied a two-level leadership adjustment under U.S.S.G. S 3B1.1(c) and that the sentencing range of 51 to 63 months was unconstitutionally disproportionate to the sentences

_____

1. The plea agreement mistakenly designates this count as Count 28. JA at 50. The underlying conduct involves Cefaratti's seizure of a tape recording and an original transcript of an incriminating conversation between him and his sister Carole from the office of the Postal Inspection Service, and his subsequent destruction of those materials.

3

imposed on other participants in his offenses. At sentencing the District Court overruled Cefaratti's objections to the PSR as well as his requests for downward departure, referring to the matter before it as "typical . .. . [of a] fraud offense . . . ." JA at 145. The court found that the two-level adjustment for playing a leadership role was warranted and imposed a sentence of 51 months, the low end of the guideline range, to be followed by a two year period of supervised release. The court also imposed $350 in special assessments and restitution of $846,000 to the DOE.

Cefaratti appealed. We have jurisdiction pursuant to 28 U.S.C. S 1291 and 18 U.S.C. S 3742(a).

B.

The Offense Conduct

According to the indictment and the PSR, Cefaratti was an owner and also the president of the Franklin School of Cosmetology and Hair Design in Elizabeth, New Jersey ("the Franklin School" or "Franklin"), one of two vocational schools for aspiring beauticians formerly owned by Cefaratti's mother. The Franklin School participated in federal student financial assistance programs, which authorized it to act as a disbursing agent for federally funded Pell Grants and to receive Stafford loan checks. The Pell Grant program provides needy students with educational grant funds without need for repayment, and the Stafford Loan program provides for federal reimbursement of defaulted student loans, thereby enabling students to obtain low-interest loans from private lenders.

Cefaratti, on behalf of the Franklin School, entered into program participation agreements with the DOE agreeing to comply with all program statutes and regulations, to use the funds solely for specified educational purposes, and to properly account for the funds the school received. Under DOE regulations, students were eligible for federalfinancial assistance only if they had a high school diploma, a general education development certificate (GED), or passed a test demonstrating their ability to benefit from the training offered by the school (ATB test). The DOE could terminate

4

a school's participation in federal student assistance programs if the school's students defaulted at excessive rates. A student was considered to be in default after a 180 day grace period if the student failed to make payments unless the student was granted a deferment or forbearance for his or her repayment obligations. Default rates in excess of 25 percent for three consecutive years could result in a school's termination from the Stafford Loan program, and a default rate in excess of 40 percent in a single year could result in termination from the Pell Grant program.

In 1993, the DOE determined that Franklin's default rates for 1991 and 1992 had exceeded 50 percent. Sometime prior to 1994 and continuing to about July 7, 1997, Cefaratti implemented a scheme to manipulate Franklin's default rate by submitting false deferment and forbearance forms to student loan lenders and by making payments on behalf of student borrowers who were on the verge of defaulting. To accomplish this, Cefaratti directed Gloria Malavet, Franklin's Director of Admissions, and Modesta Perez, its Director of Financial Aid, to monitor the loan repayment status of former students and to prepare falsified, forged forbearance or deferment forms when a student was near defaulting. These forms were then mailed to lenders, including the Pennsylvania Higher Education Assistance Agency (PHEAA) and the Student Loan Marketing Association (SALLIE MAE). For example, Count IV of the indictment, the mail fraud count to which Cefaratti pleaded guilty, charged that between November 4, 1994 and November 7, 1994, Cefaratti caused the mailing of a falsified, forged Unemployment Deferment Request Form to SALLIE MAE on behalf of a former Franklin student.

Cefaratti also directed Malavet and Perez to make payments on behalf of student borrowers who were near default (without the student borrowers' knowledge) and had Jackie Lopez, Franklin's Secretary, open a post office box in her name to which lenders could send mail addressed to students for whom false forbearance and deferment forms had been submitted. In addition, Cefaratti had Franklin employees "clean and organize" the school'sfiles so that a DOE audit would not discover that many of Franklin's

5

students had excessive absences or that Franklin had submitted loan applications from students who did not have a high school diploma, a GED, or a passing ATB test score.

These activities kept the Franklin School's default rate artificially low, ensuring the school's continuing eligibility to receive federal funding and permitting Franklin to retain funds it would otherwise have had to return. From July 1994 to July 1997, over 90 percent of Franklin's revenues came from these federal assistance programs. Had Cefaratti not manipulated Franklin's default rate in this manner, the DOE would have terminated the school's participation in federal student assistance programs no later than February of 1996 rather than, as eventually happened, in July 1997. Between February 1996 and July 1997, Franklin received over $840,000 in federal funds to which it was not entitled.

II.

DISCUSSION

Cefaratti states three issues on appeal. First, he contends, admittedly for the first time, that the superseding information charging that he engaged in monetary transactions in property derived from specified unlawful activity failed to charge, and the record did not establish a factual basis to show, that the funds involved in the transactions constituted "proceeds" of mail or wire fraud. Second, he contends that his sentence for engaging in such monetary transactions should have been calculated using the fraud guidelines rather than the money laundering guidelines. Finally, he contends that his guideline range was improperly adjusted upwards two levels under U.S.S.G. S 3B1.1(c) for a leadership role in the offenses. Our standard of review for each claim varies and will be noted in each discussion.

A.

Money Laundering Under 18 U.S.C. S 1957

Count XXIV of the indictment charged Cefaratti with violations of S 1956 of the Money Laundering Control Act of

1986. As explained in an opinion from the Tenth Circuit, that statute criminalizes "money laundering as that activity is commonly understood. . . . [by punishing] conducting a financial transaction with the proceeds of specified unlawful activity knowing that the transaction is designed to conceal or disguise the nature, location, source, ownership or control of the proceeds, or intending that the transaction be so designed." United States v. Allen, 129 F.3d 1159, 1164-65 (10th Cir. 1997). The government agreed to drop this count in exchange for Cefaratti's guilty plea to the superseding information, which charged him with violating S 1957 of the same act. Section 1957 "is similar to 18 U.S.C. S 1956, but does not require that the recipient exchange or `launder' the funds, that he have knowledge that the funds were proceeds of a specified unlawful activity, nor that he have any intent to further or conceal such an activity." U.S.S.G. S 2S1.2, Commentary. Instead, "[a] defendant must know only that she is engaging in a transaction and that the subject of the transaction is criminally derived property." Allen, 129 F.3d at 1165.

Specifically, S 1957 makes it illegal to "knowingly engage[ ] or attempt[ ] to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity . . . ." 18 U.S.C. S 1957(a); see also United States v. Sokolow, 91 F.3d 396, 408 (3d Cir. 1996) (listing elements of S 1957 offense). The statute defines a "monetary transaction" as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution . . . ." 18 U.S.C. S 1957(f)(1). "Criminally derived property" is "any property constituting, or derived from, proceeds obtained from a criminal offense . . . ." 18 U.S.C. S 1957(f)(2). Section 1957 incorporates the definition of "specified unlawful activity" in 18 U.S.C. S 1956, which includes, inter alia, those acts that constitute "racketeering activity" under the Racketeer Influenced & Corrupt Organizations Act (RICO). See 18 U.S.C. SS 1956(c)(7)(A) & 1957(f)(3). Wire and mail fraud constitute racketeering activity and therefore are "specified unlawful activities." See 18 U.S.C. S 1961(1)(B).

Cefaratti argues that the superseding information was deficient because it failed to charge an essential element of a S 1957 offense –– that the funds involved in the monetary transaction constituted or were derived from proceeds obtained from specified unlawful activity. Although he did not raise this argument before the District Court, we will consider it in light of our prior holding that a defendant may challenge an indictment for failure to charge an offense for the first time on appeal. See United States v. Spinner, 180 F.3d 514, 516 (3d Cir. 1999); see also United States v. Cabrera–Teran, 168 F.3d 141, 143 (5th Cir. 1999).2 However, when a challenge is urged for the first time on appeal we will construe the indictment liberally in favor of validity. See United States v. Ross, 206 F.3d 896, 899 (9th Cir. 2000); United States v. Sutton, 961 F.2d 476, 479 (4th Cir. 1992).

The superseding information charged that:

> Beginning prior to on or about July 1994 and continuing up to on or about July 7, 1997 . . . CEFARATTI, and others known, but not named herein, did knowingly engage and attempt to engage in monetary transactions affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, [Cefaratti] caused the transfer of both Federal Pell Grant Program funds from the Federal Reserve Bank . . . and the transfer of Federal Stafford Loan Program funds from a federally–insured bank . .. to the bank account of the Franklin Beauty School . . . in an amount in excess of $840,000, such criminally derived property having been derived from a specified unlawful activity, that is, mail fraud and wire fraud, and did aid and abet.

JA at 47–48. Cefaratti reads the information to charge merely that some form of "criminally derived property" was

---

2. Here, Cefaratti pleaded guilty to an information charging the S 1957 offense and, in doing so, waived his right to indictment by grand jury. That fact, however, is immaterial to this issue. See Government of the Virgin Islands v. Moolenar, 133 F.3d 246, 247 (3d Cir. 1998) ("The sufficiency of an information, like the sufficiency of an indictment, presents a question of law over which our review is plenary.").

"derived from a specified unlawful activity," and argues that in contrast the statute requires that the criminally derived property "constitute or `be derived from, proceeds obtained from a criminal offense.' " Appellant's Br. at 17 (quoting 18 U.S.C. S 1957(f)(2)).

An indictment (for our purposes, an information) to be sufficient must contain all essential elements of the charged offense. See Spinner, 180 F.3d at 515. However, an indictment may "set forth the offense in the words of the statute itself, as long as `those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.' " Hamling v. United States, 418 U.S. 87, 117 (1974) (quoting United States v. Carll, 105 U.S. 611, 612 (1882)). Furthermore, an indictment that charges a legal term of art "sufficiently charges the component parts of the term." United States v. Wicks, 187 F.3d 426, 429 (4th Cir. 1999); see also United States v. Kovach, 208 F.3d 1215, 1219 (10th Cir. 2000) (indictment that alleged defendant possessed forged security of an "organization" adequately alleged interstate commerce element where statutory definition of "organization" expressly incorporated that element); Hamling, 418 U.S. at 118-19 (indictment alleging material was "obscene" was adequate although it did not set forth the components of the obscenity test).

As we construe the information liberally, we reject Cefaratti's contention that it fails to allege each element of the offense. The information tracks the statutory language by alleging that Cefaratti knowingly engaged and attempted to engage in monetary transactions affecting interstate commerce in criminally derived property valued over $10,000, that property having been derived from the specified unlawful activity of wire and mail fraud. Cefaratti argues that the term "criminally derived property" in the information could be read to include property that is neither proceeds nor derived from proceeds of a criminal offense. But the statute specifically defines the term, and Cefaratti had only to read the statutory section under which he was charged to understand that the "criminally derived property" at issue -- Federal Pell Grant and

9

Stafford loan funds -- was alleged to "constitut[e], or [be] derived from, proceeds obtained from a criminal offense . . . ." 18 U.S.C. S 1957(f)(2).

Cefaratti also contends that he was not informed of the nature of the charges against him because neither the District Court nor the prosecutor explained the elements of an offense under S 1957. He relies on Fed. R. Crim. P. 11(c)(1), which requires the court, before accepting a guilty plea, to address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, "the nature of the charge to which the plea is offered . . . ." Rule 11, however, "is not to be read as requiring a litany or other ritual," and "should not be given such a crabbed interpretation that ceremony [is] exalted over substance." Fed. R. Crim. P. 11 advisory committee note (1983) (Rule 11(h)). Indeed, most courts look to the totality of the circumstances to determine whether a defendant was informed of the nature of the charges against him, considering factors such as the complexity of the charge, the age, intelligence, and education of the defendant, and whether the defendant was represented by counsel. See, e.g., United States v. Fernandez, 205 F.3d 1020, 1025 (7th Cir. 2000); United States v. Mosley, 173 F.3d 1318, 1322-23 (11th Cir. 1999); United States v. Marks, 38 F.3d 1009, 1012 (8th Cir. 1994).

Cefaratti acknowledges that the elements of the offense "need not be recited in any ritualistic fashion." Appellant's Br. at 19. He nevertheless argues that the District Court failed to ensure he understood the S 1957 offense, relying on statements in our prior cases urging the district courts of this circuit to "maintain strict observance to the requirements specified in Rule 11 in order to assure the integrity and finality of the plea process." United States v. Carter, 619 F.2d 293, 296 (3d Cir. 1980), superseded by statute as stated in United States v. Fulford, 825 F.2d 3, 7 (3d Cir. 1987). We agree with the articulated principle, but it is inapplicable here because any deviation from those requirements, if it occurred, was harmless. Rule 11 itself provides that "[a]ny variance from the procedures required by this Rule 11 which does not affect substantial rights shall be disregarded." Fed. R. Crim. P. 11(h). This harmless

10

error standard "permit[s] rejection of a Rule 11(c) challenge where the record plainly shows that the defendant understood the nature of the charges despite a flawed inquiry by the court." United States v. Maher , 108 F.3d 1513, 1521 (2d Cir. 1997); see also United States v. Liboro, 10 F.3d 861, 864 (D.C. Cir. 1993) (question is whether the defendant "was sufficiently apprised of the charges and comprehended them").

Here, the District Court conducted a detailed inquiry into whether Cefaratti's plea was knowing and voluntary. During that inquiry, Cefaratti stated that he had reviewed the information and plea agreement with his retained counsel, that he was satisfied with his counsel's performance, that he did not wish to have the superseding information read to him in open court, and that he wished to waive indictment on the S 1957 offense. Finally, the prosecutor summarized the evidence supporting each offense, and Cefaratti informed the court that he had no substantial dispute with the summary. The court accepted his plea and entered an order finding that Cefaratti understood "his rights [and] the consequences of his plea" and stating that "[t]he Court is satisfied that the plea has a basis in fact and contains all the elements of the crime charged." JA. at 82.

As this recitation of the events shows, although the District Court did not specifically inform Cefaratti of the elements of an offense under S 1957, it conducted an otherwise extensive inquiry at the plea hearing. Although Cefaratti complains that "nothing was done . . . to ensure" that he understood S 1957's requirement that criminally derived property "constitute or be `derived from, proceeds obtained from a criminal offense,' " Appellant's Br. at 20 (quoting 18 U.S.C. S 1957(f)(2)), he does not explicitly state that he misunderstood any aspect of the S 1957 charge. Given the facts of this case, such a claim would be dubious at best.

Cefaratti reviewed the S 1957 charge in the superseding information with his retained counsel, see United States v. Andrades, 169 F.3d 131, 135 (2d Cir. 1999) (noting presumption that defense counsel routinely explain the offense in sufficient detail to give the accused notice of what

11

he is being asked to admit), and listened to and acquiesced in the government's summary of facts supporting that charge. As we conclude above, the information alleged each element of the S 1957 offense, and S 1957 defines "criminally derived property" to mean property "constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. S 1957(f)(2). Moreover, Cefaratti was reasonably sophisticated, having obtained a bachelor's of science degree in accounting and having successfully managed another beauty school without incident for sixteen years. See Liboro, 10 F.3d at 864-65 (harmless error to omit "one of Rule 11's many `warnings' " where, inter alia, defendant "held a responsible position requiring considerable sophistication"). On these facts, any deviation from Rule 11(c)(1) was harmless.

Cefaratti's final contention with respect to his plea agreement is that the District Court erred under Fed. R. Crim. P. 11(f) by entering judgment when there was no factual basis to support the S 1957 count. Rule 11(f) provides that "[n]otwithstanding the acceptance of a plea of guilty, the court should not enter a judgment . . . without making such inquiry as shall satisfy it that there is a factual basis for the plea." Fed. R. Crim. P. 11(f). The court may make that inquiry by looking to the defendant's own admissions, the government's proffer of evidence, the presentence report, or "whatever means is appropriate in a specific case -- so long as the factual basis is put on the record." United States v. Smith, 160 F.3d 117, 121 (2d Cir. 1998) (quotation omitted); see also United States v. Allen, 804 F.2d 244, 245 (3d Cir. 1986). The court " `need not be convinced beyond a reasonable doubt tha[t] an accused is guilty. It need only be convinced that there is sufficient evidence to justify the reaching of such a conclusion.' " United States v. Alber, 56 F.3d 1106, 1110 (9th Cir. 1995) (quoting United States v. Neel, 547 F.2d 95, 96 (9th Cir. 1976) (per curiam)).

Here, the District Court specifically found that Cefaratti's "plea has a basis in fact," although it did not spell out the basis for that finding. United States v. Cefaratti, No. 98-cr-00212 (M.D. Pa. Oct. 30, 1998) (order accepting guilty plea). A district court's finding of a factual basis for a plea

12

is reviewed for an abuse of discretion. See Smith, 160 F.3d at 122; United States v. Mitchell, 104 F.3d 649, 652 (4th Cir. 1997); United States v. Bernaugh, 969 F.2d 858, 865 (10th Cir. 1992).3 Furthermore, although courts have held that "an insufficient factual basis can never be harmless error" under Rule 11(h), United States v. Tunning, 69 F.3d 107, 114-15 (6th Cir. 1995), they have refused to set aside a guilty plea where the record as a whole, including evidence not presented to the district court at the plea hearing, demonstrates a factual basis for the defendant's plea, see United States v. Zorrilla, 982 F.2d 28, 30-31 (1st Cir. 1992); United States v. Adams, 961 F.2d 505, 512 (5th Cir. 1992).

Cefaratti argues that the only allegation of "money laundering" in this case is that he caused "the Franklin Beauty School to receive, in its own bank accounts, the loan moneys which it had fraudulently sought" from the DOE. Appellant's Br. at 21. He argues that these funds were not proceeds until they came into Franklin's possession and that neither the information nor the government's summary of evidence at the plea hearing alleged that he conducted any monetary transactions with the funds after that point.

Cefaratti relies on United States v. Johnson, 971 F.2d 562 (10th Cir. 1992), which involved a defendant who defrauded investors into wiring funds directly to his account, ostensibly for him to buy Mexican pesos at a discount rate and later resell them at a profit. The indictment in that case charged numerous counts of money laundering in

_____

3. The government maintains that Cefaratti's failure to raise this issue before the District Court necessitates plain error review -- an issue on which there is some disagreement in the courts. Compare United States v. James, 210 F.3d 1342, 1343 (11th Cir. 2000) (per curiam) (plain error review), United States v. Angeles-Mascote, 206 F.3d 529, 530 (5th Cir. 2000) (same), and United States v. Akinsola, 105 F.3d 331, 333 (7th Cir. 1997) (same), with United States v. Glinsey, 209 F.3d 386, 394 & n.8 (5th Cir. 2000) (no plain error review, variance from Rule 11 reversible unless harmless), United States v. Odedo, 154 F.3d 937, 940 (9th Cir. 1998) (same), and United States v. Lyons, 53 F.3d 1321, 1322 n.1 (D.C. Cir. 1995) (same). We need not decide this issue in light of our disposition.

13

violation of SS 1956 and 1957, some of which were based on the wiring of funds from the investors directly to the defendant's account and some of which were based on the wiring of funds from the defendant's bank to the investors. The funds involved in all of the transactions were alleged to be proceeds of wire fraud, and the defendant was convicted on all but one of the counts. The court affirmed some of the convictions and reversed others. It reversed the convictions based on the wire transfers from the investors to the defendant on the ground that the defendant "cannot be said to have obtained the proceeds of the wire fraud until the funds were credited to his account." Id. at 570. By contrast, the court upheld the defendant's convictions based on the wire transfers from the defendant's bank to the investors, which occurred after the wire fraud took place.

Our precedent is consistent with the court's decision in Johnson. For example, in discussing the term"proceeds" in the context of S 1956 (the same term as inS 1957), we have stated that "[a]lthough [the section] does not define when money becomes `proceeds,' it is obvious to us that proceeds are derived from an already completed offense, or a completed phase of an ongoing offense, before they can be laundered." United States v. Conley, 37 F.3d 970, 980 (3d Cir. 1994). However, this does not help Cefaratti. The counts in Johnson that were insufficient were those where "the only use of the wires alleged . . . to prove the predicate wire fraud crimes were the very wire transfers that allegedly [violated S 1957]." United States v. Kennedy, 64 F.3d 1465, 1478 (10th Cir. 1995). Thus, in those instances, the government failed to prove a monetary transaction occurring "after the completion" of criminal activity. Id. By contrast, the mail fraud to which Cefaratti pleaded guilty was completed when he mailed fraudulent materials in furtherance of his scheme to defraud. See id. ; see also JA at 78-79 (prosecutor's statement that Cefaratti submitted fraudulent materials by wire as well as by mail). Thus, when he engaged in monetary transactions with proceeds of the criminal activity after the completion of the mail fraud, Cefaratti's actions fell within the statute.

As explained in the government's brief and as set forth in

14

the indictment, which was before the District Court at the plea hearing, the Stafford Loan checks were mailed to Franklin and made payable to both the student borrower and the school. These checks had to be endorsed by both the borrower and a representative of Franklin before they could be deposited into the school's account. We agree with the government that, at the latest, the checks became criminally derived property when they were endorsed by the student borrowers and that any subsequent monetary transactions, including deposits, violated S 1957. See 18 U.S.C. S 1957(f)(1) (monetary transactions include deposit). This provides an adequate basis for Cefaratti's plea. We see no legal basis for Cefaratti's argument that "[a] check, as such, cannot be `proceeds' . . . ." Appellant's Reply Br. at 4; see United States v. Haun, 90 F.3d 1096, 1100 (6th Cir. 1996) (where automobile dealer applied for false titles and used titles to defraud purchasers, purchasers' checks represented proceeds under S 1956); United States v. Hemmingson, 157 F.3d 347, 355 (5th Cir. 1998) (rejecting argument that the funds from a check, rather than the check itself, were proceeds of interstate transportation of stolen property); Kennedy, 64 F.3d at 1477–78 (rejecting position that deposit of checks received from defrauded investors did not violate S 1956).[4]

Furthermore, there is little question that the funds Franklin unlawfully obtained were subsequently re-invested in the Franklin School. As we have stated, Franklin operated during the three year period between July 1994 and July 1997 while receiving over 90 percent of its revenues from Stafford Loan and Pell Grant funds. Moreover, in a letter Cefaratti submitted to the probation officer who was preparing the PSR, Cefaratti specifically acknowledged "that the money received through the [fraudulent activities] . . . was used to enable me to continue to operate and expand the Franklin Beauty School and thereby permit me the continuation of the frauds in which I was engaged. Among other things, the improperly

_____

4. Cefaratti has not argued that the deposit of these checks failed to meet the requirement that the monetary transaction involve criminally derived property valued greater than $10,000.

received proceeds were used to build an addition onto the Franklin Beauty School." PSR at 7.

Cefaratti argues that his letter to the probation officer, despite its clear admission, cannot support his guilty plea for two reasons. First, he argues that there is no reason to think that the PSR "was using the term [proceeds] in the technical sense defined by this Court . . . ." Appellant's Reply Br. at 5. However, it was Cefaratti himself, while represented by counsel, who used the term "proceeds," and he did so in a letter describing his offense conduct. We have no reason to interpret it to mean anything other than what it says. In any event, Cefaratti admitted the underlying facts which demonstrate that the transactions at issue involved proceeds in the technical sense.

Second, Cefaratti argues that the District Court did not rely upon his statement quoted in the PSR when it accepted his guilty plea and that "this Court cannot find and rely on a different" factual basis on appeal. Id. However, Cefaratti's admission of the use of proceeds was before the District Court at the time of sentencing, and he never sought to explain or withdraw his statement.5 Nor did he seriously argue that the expansion of Franklin with funds obtained from the mail fraud could not constitute a monetary transaction with proceeds of the mail fraud.

Cefaratti has failed to show prejudice from the failure to articulate all of the details of the factual basis supporting his guilty plea to a violation of S 1957. See Fed. R. Crim. P. 11(h); Zorrilla, 982 F.3d at 30.6  We reject his challenge on appeal to his conviction on the counts to which he pled guilty.

_____

5. Unlike the situation in Allen, 804 F.2d at 247, on which Cefaratti relies, in this case the District Court did not proceed under "a misunderstanding of what the defendant ha[d] admitted."

6. Our disposition makes it unnecessary to decide the government's contention that Cefaratti may not raise this challenge to his guilty plea on appeal.

B.

The Application of U.S.S.G. S 2S1.2

Cefaratti also challenges his sentence, arguing that the District Court erred by applying U.S.S.G. S 2S1.2, the guideline applicable to a money laundering conviction under S 1957. Cefaratti argues that his is an"atypical case [in which] the guideline section indicated for the statute of conviction is inappropriate . . . ." U.S.S.G. Introduction to App. A. He contends that he should have been sentenced under U.S.S.G. S 2F1.1, the fraud guideline. Cefaratti's argument is based on United States v. Smith, 186 F.3d 290, 300 (3d Cir. 1999), a recent case in which we concluded that "the heartland of U.S.S.G. S 2S1.1 is the money laundering activity connected with extensive drug trafficking and serious crime." Because he did not raise this objection to his sentence before the District Court we will review for plain error, see United States v. Knobloch, 131 F.3d 366, 370 (3d Cir. 1997), although we note that our decision in Smith was filed on August 9, 1999, more than two months after Cefaratti was sentenced.

The defendants in Smith had been convicted of four offenses -- conspiracy to defraud, interstate transportation of stolen property, causing unlawful interstate travel with intent to distribute stolen property, and money laundering -- arising out of an embezzlement/kickback scheme. GTECH, a lottery service company that sought help in obtaining lottery contracts, hired a consultingfirm which submitted inflated invoices to GTECH for its services and, in return, the consulting firm gave kickbacks to defendant Smith, GTECH's national sales manager. At leastfifteen checks were made payable directly to Smith's creditors. Based on those payments to Smith's creditors, the defendants were convicted of money laundering under 18 U.S.C. S 1956.

The district court in Smith calculated the defendants' sentences based on U.S.S.G. S 2S1.1, which applies to convictions under S 1956. On appeal, we held that the court erred in using S 2S1.1 rather than U.S.S.G. S 2F1.1, the fraud guideline. We noted that the Sentencing

17

Commission originally established high base offense levels for the money laundering guidelines to penalize the conduct that had concerned Congress: "1) situations in which the `laundered' funds derived from serious underlying criminal conduct such as a significant drug trafficking operation or organized crime; and, 2) situations in which thefinancial transaction was separate from the underlying crime and was undertaken to either: a) make it appear that the funds were legitimate, or b) promote additional criminal conduct by reinvesting the funds in additional criminal conduct." Smith, 186 F.3d at 298 (quoting United States Sentencing Commission, Report to the Congress: Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report at 4 (Sept. 18, 1997)).

We concluded that the defendants' conduct in Smith which was the basis of the money laundering charges, the 15 checks sent to Smith's creditors, did not implicate these concerns and was merely an "incidental by-product of the kickback scheme." Id. at 300 (quotation omitted). Because the "root of the defendants' activity" was fraud, we stated that "[t]o use the money laundering guideline in this routine fraud case would let the `tail wag the dog.' " Id. Moreover, by sending the checks directly to defendant Smith's creditors, the defendants left a paper trail that was "inconsistent with planned concealment." Id.

Cefaratti's argument assumes that our holding in Smith regarding the applicability of U.S.S.G. S 2S1.1 to the Smith defendants' S 1956 convictions pertains equally to U.S.S.G. S 2S1.2, which applied to Cefaratti's conviction under 18 U.S.C. S 1957. We will assume arguendo that it does.7 This case, however, does not require us to determine the circumstances under which a defendant's conduct will fall

_____

7. Our holding in Smith concerning sentencing under U.S.S.G. S 2S1.1 implicitly echoed a concern expressed by other courts when evaluating a defendant's S 1956 conviction over transforming that section from a money laundering statute into a "money spending statute." See United States v. Sanders, 928 F.2d 940, 946 (10th Cir. 1991). That concern may be implicated to a lesser degree by S 1957. See D. Randall Johnson, The Criminally Derived Property Statute: Constitutional and Interpretive Issues Raised by 18 U.S.C. S 1957, 34 Wm. & Mary L. Rev. 1291, 1302 (1993) (unlike S 1956, S 1957 "is indeed a `money spending statute' ").

18

outside the heartland of U.S.S.G. S 2S1.2, because it is clear that Cefaratti was appropriately sentenced under that guideline.

Cefaratti contends that the District Court should have based his sentence on the fraud guideline because his conduct did not involve large scale drug trafficking or organized crime. However, nothing in Smith states or suggests that S 2S1.1 or S 2S1.2 can be used only for defendants who have engaged in such conduct. Prior to Smith, many of our decisions applied U.S.S.G.SS 2S1.1 and 2S1.2 in situations involving conduct similar to Cefaratti's and did not question the propriety of that application of the guidelines. See, e.g., United States v. Morelli, 169 F.3d 798, 809 n.13 (3d Cir. 1999) (sentencing under S 2S1.1; proceeds of scheme to embezzle excise taxes on fuel sales laundered by wiring funds between companies controlled by defendants); United States v. Cocivera, 104 F.3d 566, 570 n.2 (3d Cir. 1996) (summarily rejecting argument that S 2F1.1 rather than S 2S1.2 should have been applied where defendant who had committed medicare fraud and other crimes was also convicted of 22 counts underS 1957); United States v. Conley, 92 F.3d 157, 162–63 (3d Cir. 1996) (sentencing under S 2S1.1; defendant convicted of running illegal gambling scheme and conspiring to do the same and to launder the proceeds); United States v. Sokolow, 91 F.3d 396, 410–13 (3d Cir. 1996) (defendant sentenced under S 2S1.2 for, inter alia, misrepresenting the nature of his benefits plan and defrauding plan members of insurance premiums; indictment alleged defendant laundered funds through a series of accounts, property, and mortgages); United States v. Thompson, 40 F.3d 48, 50 (3d Cir. 1994) (defendants who intercepted and diverted funds mailed to securities firm sentenced under S 2S1.1); United States v. Cusumano, 943 F.2d 305, 312–14 (3d Cir. 1991) (sentencing under S 2S1.1 where underlying conduct was embezzlement/kickback scheme involving employee benefit plan; rejecting argument that "core" offense of conviction was kickback scheme rather than money laundering).

Other than distinguishing our decision in United States v. Cusumano on the basis that it was issued prior to the Sentencing Commission's report to Congress, our opinion

19

in Smith gave no indication that it intended a radical departure from this precedent. The authority relied upon in Smith did not suggest the restrictive application of S 2S1.1, let alone S 2S1.2, that Cefaratti urges. Although we held in Smith that the heartland of S 2S1.1 was "money laundering activity connected with extensive drug trafficking and serious crime," we relied particularly on language in a report of the House Judiciary Committee explaining Congress' rejection of proposed amendments to the money laundering guidelines. We quoted the statement in the report that, "the application of the current guidelines to receipt-and-deposit cases, as well as to certain other cases that do not involve aggravated money laundering activity, may be problematic." Smith, 186 F.3d at 299 (quoting H.R. Rep. No. 104-272, at 14-15, reprinted in 1995 U.S.C.C.A.N. 335, 348-49) (emphasis added in Smith). 8 The House Report continued that "past sentencing anomalies arising from relatively few cases do not justify a sweeping downward adjustment in the money laundering guidelines." Id. (quoting Report) (emphasis added in Smith).

Smith also relied on the Justice Department's less-than-uniform adherence to its stated policy that the money laundering statutes "should not be used in cases where the money laundering activity is minimal or incidental to the underlying crime." Id. at 299 (quotation omitted). Both the Justice Department and the House Report were concerned that application of the money laundering guidelines may be problematic in anomalous cases, such as where the defendant simply deposits the proceeds of crime or where the laundering activity is minimal or incidental to the underlying crime. Neither the House Report nor the Justice Department policy suggest that sentencing under the money laundering guidelines is appropriate only when the

_____

8. In Morelli, which was decided several months before Smith, a defendant sentenced under the money laundering guidelines argued that he was entitled to a downward departure on the basis of the proposed amendments that had been rejected by Congress. In rejecting that argument, we stated that "proposed amendments to the Sentencing Guidelines do not provide independent legal authority for a downward departure," although we did not mention the House Report. Morelli, 169 F.3d at 809 n.13.

20

defendant has engaged in drug trafficking or organized crime.

The facts in Smith suggest that we too were particularly concerned that the money laundering at issue there-- simply sending checks to the defendant's creditors-- amounted to little more than receipt and deposit of funds obtained by fraud. We therefore read Smith, in conjunction with our prior cases, to stand for the unremarkable principle that in certain cases "strict focus on the technicalities of the sentencing process obscures the overarching directive to match the guideline to the offense conduct . . . ." Id. at 300 (quotation omitted). In Smith, the overarching offense conduct was "routine fraud," and the money laundering, though technically a violation ofS 1956, was merely an "incidental by product" of that fraud. Id.

Cefaratti next argues that the money laundering he engaged in was at most part and parcel of his student loan fraud scheme. This equates to an argument that his conduct as a whole was little more than routine fraud to which the money laundering was incidental. See  Appellant's Br. at 31 & n.8 (referring to Cefaratti's fraud as"garden variety fare" in federal court).

Cefaratti notes that the parties and the court at sentencing seemed to view his conduct as typical of a fraud case. He points to his counsel's argument that Cefaratti only continued the fraudulent activities begun by his sister Carole, who had formerly operated Franklin, because he hoped to revitalize the school and eventually to legitimize its practices. See JA at 117-21. Likewise, the prosecutor referred to Cefaratti's case as "a typical fraud case made a bit atypical because of efforts made to destroy evidence . . . ." JA at 122. And the District Court, in denying Cefaratti's request for a downward departure, stated: "[T]his is a typical thing. I mean I have more fraud offenses for people who are trying to salvage businesses . . . ." JA at 145.

Nonetheless, we cannot agree that the District Court committed plain error in sentencing Cefaratti under U.S.S.G. S 2S1.2. Cefaratti characterizes the money laundering in this case as simply the "receipt of the funds

21

from the government, which did not aggravate or conceal the fraud offense in any way." Appellant's Br. at 26. To be sure, the deposit of the fraudulently-obtained Stafford loan checks can be characterized in this manner. However, in Smith we emphasized the concern of Congress and the Sentencing Commission with separate financial transactions undertaken to legitimize illegally-obtained funds or to promote additional criminal conduct. Smith, 186 F.3d at 298. The evidence in this case demonstrates that Cefaratti used the proceeds of his mail and wire fraud to promote further acts of fraud.

As we have said, over 90 percent of Franklin's revenues during a three year period came from Pell Grant and Stafford loan funds. Although the record does not make clear what percentage of these funds were obtained by fraud, Cefaratti does not argue that the percentage was insubstantial or that he only reinvested in Franklin the funds he had obtained legally. See United States v. Threadgill, 172 F.3d 357, 377-78 (5th Cir. 1999) (affirming downward departure in S 1956 case where defendants laundered only around three percent of illegal gambling revenues and did not use laundered money to finance other criminal activity). In fact, Cefaratti specifically admitted that he used the proceeds of his crimes to continue"the frauds in which [he] was engaged," for example by building an addition to the Franklin School. PSR at 7. Significantly, Cefaratti also admitted to making payments to various lenders so "that it would appear as if the students . . . were not in default," PSR at 6, and does not suggest that he never used proceeds of his fraud for this purpose.

As it is clear Cefaratti used criminally derived property to promote further fraud, we cannot say that such conduct is minimal or incidental to the underlying fraud, and we therefore conclude that the District Court did not commit plain error in sentencing Cefaratti under U.S.S.G.S 2S1.2. See, e.g., United States v. Ross, 210 F.3d 916, 928 (8th Cir. 2000) (downward departure from U.S.S.G. S 2S1.1 inappropriate where defendant led scheme to defraud investors and reinvested virtually all of the proceeds in the scheme); United States v. Woods, 159 F.3d 1132, 1136 (8th Cir. 1998) (stating "[w]e believe [departure from U.S.S.G.

22

S 2S1.2 was appropriate] because . . . deposit of the check had the effect of concluding, rather than promoting, the . . . fraud").9

C.

The Leadership Adjustment

The District Court calculated Cefaratti's sentence by grouping counts IV (the mail fraud count) and XXIII (the student loan fraud count) of the indictment with theS 1957 (money laundering) count in the information pursuant to U.S.S.G. S 3D1.2(b), because the counts involved the same victim and two or more acts constituting a common scheme, and also included in that group count XXVII of the indictment (for destruction of property) pursuant to U.S.S.G. S 3D1.2(c). Neither party challenges this method of grouping. After grouping, the court added two levels based on the PSR's finding that Cefaratti "had a managerial role over at least three other criminal participants (Gloria Malavet, Modesta Perez and Jackie Lopez)." PSR at 8. The court added "that there was a point in time where Malavet and Perez attended a conference on funding and realized that what they were doing was wrong. . . . [Cefaratti advised them] not to worry about it and to continue their practice." JA at 144.

Cefaratti's primary contention, and the only one that merits discussion, is that when "counts are grouped under U.S.S.G. S 3D1.2(a), (b), or (c), the guideline level [including any adjustments] for each count is first to be determined separately" before grouping. Appellant's Br. at 34. When counts are grouped under these sections, the defendant's sentence is based on "the highest offense level of the counts in the Group." U.S.S.G. S 3D1.3(a). In this case, the court, applying that instruction, based Cefaratti's sentence on the offense level applicable to the S 1957 count.

_____

9. In keeping with our standard practice, we decline to consider Cefaratti's claim that his trial counsel was ineffective for failing to raise
this issue at sentencing. See Cocivera, 104 F.3d at 570.

Cefaratti argues that even if he had been a leader in the fraud, which he disputes, he played no leadership role in the money laundering, and that the offense level applicable to the fraud count, even when adjusted for the leadership role, would have been less than that for the (unadjusted) S 1957 count. The offense level applicable to the group would therefore have been two levels lower. Cefaratti objected to the leadership adjustment in the District Court, but not on this basis. Because Cefaratti never presented the District Court with any variant of the technical argument he now raises, we review for plain error. See Knoblach, 131 F.3d at 370.

We cannot find error, much less plain error, in the District Court's sentence. Even if Cefaratti is correct that the court should have determined the applicability of the adjustment before grouping, there was sufficient evidence to support a leadership adjustment on both the fraud and the money laundering count. "The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of [U.S.S.G.]S 1B1.3 (Relevant Conduct) . . . and not solely on the basis of elements and acts cited in the count of conviction." U.S.S.G. Ch. 3 pt. B, introductory commentary. Relevant conduct includes, inter alia, "all acts and omissions committed, . . . commanded, . . . or willfully caused by the defendant . . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. S 1B1.3(a).

Here, the record contains ample evidence that Cefaratti played a leadership role with respect to the money laundering. At sentencing Cefaratti's counsel specifically admitted that Cefaratti "did exercise a managerial function with respect to the secretarial staff," JA at 132, and did not qualify this admission by stating that the managerial function extended only to the fraud. Instead, his counsel argued that the ultimate goal of Cefaratti's leadership was to cease Franklin's unlawful practices and that, in order to accomplish that goal, Cefaratti had to "run the business. . . ." JA at 132. But, counsel further stated that Cefaratti's conduct in running Franklin "did include acts of

24

wrongdoing. There is no question about it. So he exercised leadership." JA at 132. Cefaratti was, of course, present at the hearing and did not object to these statements.

Furthermore, the record demonstrates that Cefaratti instructed Malavet and Perez to submit fraudulent deferment and forbearance forms and to mail checks on behalf of student borrowers who were nearing default. It was the funds derived from those fraudulent activities that were "laundered" within the meaning of S 1957 and used to promote additional fraud. Cefaratti's leadership in instructing his employees to continue their fraudulent practices was relevant conduct that supported an adjustment on the money laundering count. Without his ongoing leadership of the fraud over a period of at least three years, "there would have been no ill-gotten gains to launder." United States v. Nicolaou, 180 F.3d 565, 574 (4th Cir. 1999) (leadership of illegal gambling relevant conduct that could support adjustment to money laundering count); United States v. Savage, 67 F.3d 1435, 1443 (9th Cir. 1995) (defendant's role in mail and wire fraud scheme is relevant conduct for purposes of determining his aggravating role in money laundering). It follows that the District Court did not err in imposing the adjustment for leadership.

III.

CONCLUSION

Cefaratti, who negotiated an advantageous plea agreement with the Justice Department for the dismissal of 24 counts, including one charging violation of 18 U.S.C. S 1956 (a money laundering offense), in return for his agreement to plead guilty to four counts charging, inter alia, violation of 18 U.S.C. S 1957 (a different money laundering offense with a lesser penalty) in the superseding information, and who raised no objection to the factual recitations made by the government at the hearings on the plea agreement and the sentencing, now appeals raising highly technical arguments never raised in the District Court. The government argues that this represents an impermissible disavowal of the plea agreement. We have,

25

nonetheless, reviewed the arguments on their merits and conclude that they are not persuasive.

For the reasons set forth above, we will affirm the judgment of conviction and sentence.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit