

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-30-2001

# United States v. Diaz

Precedential or Non-Precedential:

Docket 00-3168

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. Diaz" (2001). *2001 Decisions.* Paper 65.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/65

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 30, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3168

UNITED STATES OF AMERICA

v.

CAROLE DIAZ, aka
CAROLE M. CEFARATTI

      Carole Cefaratti-Diaz,

      Appellant

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal Action No. 99-cr-00065)
District Judge: Honorable Sylvia H. Rambo

Argued September 14, 2000

Before: ROTH, MCKEE and RENDELL, Cir cuit Judges

(Opinion filed: March 30, 2001)

      David M. Barasch
      United States Attorney

      Theodore B. Smith, III (Argued)
      Assistant U.S. Attorney
      228 Walnut Street
      Harrisburg, PA 17108

      Attorneys for Appellee

          Edna Ball Axelrod, Esquire (Argued)
          76 South Orange Avenue
          Suite 305
          South Orange, NJ 07079

           Attorney for Appellant

OPINION OF THE COURT

ROTH, Circuit Judge:

Defendant, Carole Diaz, a/k/a Carole M. Cefaratti ("Diaz"), pled guilty to a four-count information that included charges of fraud, in violation of 18 U.S.C. SS 1341 and 1342, and money laundering, in the form of engaging in a monetary transaction in property derived from specified unlawful activity, in violation of 18 U.S.C. S 1957(a). She was sentenced under the federal Sentencing Guidelines to a term of 33 months in prison, fined, and ordered to pay restitution to the United States Department of Education ("DOE") in the amount of $846,000.

On appeal, Diaz challenges two aspects of her sentence. First, she argues that the District Court err ed in computing her prison term based on the sentencing guideline applicable to the money laundering charge, U.S.S.G. S 2S1.2, rather than the guideline applicable to the fraud charge, U.S.S.G. S 2F1.1. The latter guideline would have resulted in 6-12 fewer months in prison. This issue requires us to consider whether Amendment 591 to the Sentencing Guidelines, effective on November 1, 2000, should apply retroactively to Diaz's sentence and whether our decision in United States v. Smith, 186 F.3d 297 (3d Cir. 1999) remains good law, at least for sentences imposed prior to the effective date of the amended guidelines. If Smith is still applicable to Diaz's situation, we must also review and reconcile several recent opinions interpreting Smith and the "heartland" of the money laundering guideline, including United States v. Mustafa , 238 F.3d 485 (3d Cir. 2001), United States v. Bockius , 228 F.3d 305 (3d Cir. 2000), and a decision involving the same issue from Diaz's brother and co-misfeasor, United States v. Cefaratti,

2

221 F.3d 502 (3d Cir. 2000). Second, Diaz challenges the amount of restitution she was order ed to pay.

For the reasons that follow, we hold that Diaz should have been sentenced under the fraud guideline rather than the money laundering guideline, and we will vacate the sentence and remand this case to the District Court for resentencing under S 2F1.1. We will affirm the decision of the District Court with regard to the amount of restitution that Diaz must pay.

I. FACTS AND PROCEDURAL HISTOR Y

Diaz, along with her brother, Frank Cefaratti ("Cefaratti"), and her sister, owned the Franklin School of Cosmetology and Hair Design ("Franklin School"), a for –profit vocational school for aspiring beauticians. Diaz and Cefaratti were responsible for day-to-day operations, with Diaz primarily in charge from 1992 through July 1994, when her siblings bought her out and Cefaratti assumed control of the school.

The Franklin School participated in federal student financial assistance programs, including the Pell Grant Program, in which financially needy students obtained grants to cover tuition and expenses,[1] and the Federal Stafford Loan Program, through which students could obtain federally guaranteed, low-interest loans from private lenders.[2] The Franklin School was authorized to act as a

_____

1. Pell Grant funds are transferred fr om the United States Treasury directly to the school's trust account, wher e they are held in trust until
the school is authorized to transfer the money into its operating account to pay the student's bills for tuition and other expenses. Students need not repay Pell Grant funds.

2. Stafford loans are guaranteed against default by state and private not-for-profit guarantee agencies. In the event of default by the student-borrower, the lender may file a default claim against the guarantee issued by the guarantee agency, which, if unable to recover from the student, in turn is authorized to seek r eimbursement for the loss from the DOE. Stafford funds are mailed by the private lender to the school in the form of a check made payable to the student and the school. Once the student endorses the check, the school deposits it into its account to cover the student's expenses.

3

disbursing agent for Pell Grants and to receive Stafford loan checks.

In order to participate in the programs, Diaz and others, on behalf of the Franklin School, agreed with the DOE that the school would comply with all program rules and regulations, would use the funds advanced solely for the specified educational purposes, and would pr operly account for the funds received. DOE regulations limit eligible students to those who had a high school diploma or a general educational development program diploma ("GED") or had passed a test demonstrating their ability to benefit from the training offered by the school. The DOE may limit or terminate a school's participation in federal student financial assistance programs if the school's students default at excessive rates. A student is consider ed in default if, after 180 days, the student has not made repayments on the loan and has not requested and been granted deferment, forbearance, or some other temporary postponement of repayment obligations. Repayment obligations begin six months after a student has left school. The DOE determines default rates accor ding to the percentage of students who must begin r epayment in a given fiscal year and who default prior to the end of the following year. Under the regulations, default rates exceeding 25 percent for three consecutive years may result in a school's automatic termination fr om the Stafford Loan Program and default rates in excess of 40 per cent for one year make a school subject to termination fr om the Pell Grant Program.

Beginning in or around October 1992, Diaz dir ected employees of the Franklin School to prepar e and mail falsified forbearance and deferment for ms to lenders in the name of former Franklin School students who had obtained financial assistance and were close to defaulting. These employees, at Diaz's direction, forged student signatures on these forms, used language given to them by Diaz in completing the forms, and falsely repr esented themselves, in telephone conversations with lenders, as for mer Franklin School students needing deferment or forbearance forms.[3]

_____

3. Only former students could request and receive such forms.

4

Diaz then caused the Pell funds received fr om the Treasury and the Stafford funds received fr om private lenders to be transferred from Virginia and Pennsylvania to the school's account in New Jersey. During the time that Diaz dir ected the school and used these funds for its operation, the school was a legitimate enterprise.

Diaz also directed that a Franklin School employee prepare and mail a false federal student loan application, in the name of Carole Diaz, to several private banks to determine whether they would make loans to Franklin School students. In early 1994, a bank in Wilkes Barre, Pennsylvania, made a loan to Carole Diaz and mailed a check in the amount of $2,625, payable to the Franklin School and Carole Diaz, which Diaz deposited into her personal account. Franklin School employees, again at Diaz's direction, completed and submitted false attendance status reports for "Carole Diaz" to the New Jersey Higher Education Assistance Authority. Finally, Diaz dir ected employees to officially register "Car ole Diaz" as a student and to create a file in that name, in the event of an audit.

In 1993, the DOE determined that the Franklin School's default rates for 1991 and 1992 had exceeded 50 per cent; the school therefore faced termination from the federal assistance programs if its default rate was again excessive in 1993. Ninety percent of the Franklin School's revenues came from federal student financial assistance funds; thus, the school would likely have been forced to close if it were terminated from the programs. In February 1996, the DOE determined the school's 1993 default rate to be 9.5 percent, a falsely and artificially low figure that was based on the false forbearance and deferment forms submitted at Diaz's instruction between 1992 and July 1994. The false forms made it appear that numerous former Franklin School students had received deferment or forbearance, when in fact they were in default. The true default rate was much higher than 25 percent and, but for the fraudulent deferment and forbearance forms, would have resulted in the school being terminated from the federal student financial assistance programs in February 1996. The submission of the false forms enabled the school to remain in the programs and therefore to continue operating

5

through and beyond July 1994, when Diaz was r emoved from her position and replaced by Cefaratti. The school continued to receive Stafford and Pell funds until July 1997, when it was terminated from thefinancial assistance programs. Between February 1996 and July 1997, the school received and deposited approximately $846,000 in funds from the Pell and Stafford pr ograms. The school was not legally entitled to these funds and it would not have received them but for the use of false forbearance and deferment forms.

Diaz was charged in a four-count infor mation, filed on March 11, 1999, in the United States District Court for the Middle District of Pennsylvania. Count I char ged mail fraud, in violation of 18 U.S.C. SS 1341 and 1342, based on the mailing of falsified forbearance forms in April 1994; Count II charged federal student assistance fraud, in violation of 20 U.S.C. S 1097(a), based on the school's receipt of student loan and grant funds fr om October 1992 until July 1997; Count III charged money laundering under 18 U.S.C. S 1957(a),4 based on the deposit of the Stafford and Pell funds into the school's accounts, again covering the period from 1992 until July 1997; and Count IV charged making a false statement, in violation of 18 U.S.C. S 1014, based on the loan application submitted in the name of "Carole Diaz." Also on Mar ch 11, Diaz entered into a plea agreement, waiving indictment and pleading guilty to the four counts in the information. The United States agreed not to bring any other criminal char ges, other than possible criminal tax charges, against Diaz based on her involvement in these offenses. It also agr eed to recommend a prison sentence within the guideline range and to recommend that Diaz receive a three-point reduction in her offense level if she clearly demonstrated acceptance of responsibility for her conduct. The District Court accepted Diaz's guilty plea at a hearing on May 18, 1999.

_____

4. That section provides that whoever "knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity" may be subject to fine and imprisonment for up to ten years. See 18 U.S.C. SS 1957(a), (b).

The presentence investigation report ("PSI") computed a total offense level under the sentencing guidelines of 22. The report calculated a base offense level of 17, applying U.S.S.G. S 2S1.2, the guideline applicable to a S 1957(a) offense. The PSI increased this by four levels because the value of the funds was between $600,000 and $1 million, pursuant to U.S.S.G. SS 2S1.2(b)(2) and 2S1.1(b)(2)(E); by two levels because the funds were proceeds of specified unlawful activity, pursuant to U.S.S.G. S 2S1.2(b)(1)(B); and by another two levels based on Diaz's managerial r ole with respect to other participants in the criminal conduct, pursuant to U.S.S.G. S 3B1.1(c). The PSI then recommended a three-level downward adjustment for acceptance of responsibility, pursuant to U.S.S.G. SS 3E1.1(a), (b). Diaz had no prior criminal record, giving her a criminal history category of I. The guideline range under the PSI was 41 to 51 months. The PSI also determined that the government was entitled to restitution, pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. S 3663A and 18 U.S.C. S 3664(f)(1)(A), in the amount of $846,000 and that Diaz was liable for full restitution.

Diaz objected to three aspects of the PSI. First, she argued that, under our decision in United States v. Smith, 186 F.3d 290 (3d Cir. 1999), her conduct was outside the heartland of the money laundering guideline and she therefore should have been sentenced under the fraud guideline, U.S.S.G. S 2F1.1. This would have r esulted in a base offense level of six, a total offense level of 18, and a prison range of 27 to 33 months. Second, Diaz ar gued that some of the $846,000 received by the Franklin School from the DOE, and therefore ordered in restitution, was not improperly used and that any amounts legitimately used should be deducted from the restitution amount. Finally, Diaz sought an additional downward departur e for diminished capacity.

At sentencing on February 4, 2000, the District Court heard testimony and arguments on those objections. The Court rejected Diaz's argument as to the appropriate guideline, stating that this was a money laundering offense. The Court granted a two-level departure for diminished

capacity, reducing the offense level to 20, a custody range of 33 to 41 months; the court sentenced Diaz to 33 months, the bottom of that range.5 The Court ordered that Diaz pay restitution in the amount of $846,000, although the Court allowed credit for any amounts that Diaz could show had been paid back.

Diaz timely appealed.

## II. JURISDICTION

The District Court had original jurisdiction over an offense against the United States, pursuant to 18 U.S.C. S 3231. We have appellate jurisdiction over an appeal of a final decision by a District Court, pursuant to 28 U.S.C. S 1291, and over an appeal of a final sentence in a criminal case, pursuant to 18 U.S.C. S 3742(a).

## III. APPLICABLE GUIDELINE

We first address Diaz's argument, based upon our decision in Smith, supra, that the District Court erred in computing her sentence by applying the money laundering guideline, U.S.S.G. S 2S1.2, rather than the fraud guideline, U.S.S.G. S 2F1.1. Diaz was convicted of four separate offenses, including fraud under 18 U.S.C.SS 1341 and 1342, and money laundering, under S 1957(a), for engaging in a monetary transaction in criminally derived pr operty from specified unlawful activity.

Under the sentencing guidelines, the District Court must group the counts into a single unit when ther e are multiple counts all involving substantially the same har m to the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. See U.S.S.G. S 3D1.2(b); see also Smith, 186 F.3d at 297. The victim in all of Diaz's

_____

5. During the sentencing hearing, the parties discussed what the guideline range would have been had the District Court accepted Diaz's argument and sentenced under the fraud guideline. After the two-level reduction for diminished capacity, the total of fense level would be 16, resulting in a custody range of 21 to 27 months.

offenses was the same, the DOE. All of her acts were part of a common plan: to keep the Franklin School eligible for, and continuing to receive, Pell and Staf ford funds by reducing the school's student default rates. After grouping the offenses, the District Court must apply to the entire group the highest offense level applicable to the counts in the unit. See U.S.S.G. SS 3D1.3(a), 3D1.4; see also Smith, 186 F.3d at 297. In the instant case, S 2S1.2, the money laundering guideline, carried a base offense level of 17, while S 2F1.1, for fraud, carried a base of fense level of 6; therefore, the District Court applied the higher guideline for money laundering to the entire unit. The initial choice of guideline is a legal question that, having been raised by Diaz before the District Court, is subject to plenary review on appeal. See Smith, 186 F.3d at 297.

A

We first must consider whether to apply the pre–amendment sentencing guidelines, as we interpr eted them in Smith, or the sentencing guidelines as amended by Amendment 591, effective November 1, 2000. 6 The general rule is that a defendant should be sentenced under the guideline in effect at the time of sentencing. See United States v. Menon, 24 F.3d 550, 566 (3d Cir . 1994) (citations omitted); U.S.S.G. S 1B1.11(a). Diaz was sentenced in February 2000, prior to the effective date of Amendment 591. But an amended guideline may be applied retroactively if it merely clarifies the law in existence at the time of sentencing. See United States v. Mar molejos, 140 F.3d 488, 490 (3d Cir. 1998). The question, therefore, is whether Amendment 591 clarifies the prior version of the guidelines so that it can be applied retr oactively to Diaz's sentence. If it can be applied retroactively, we must affirm the sentence.

We avoided the question of retroactivity in Mustafa, 238 F.3d at 496, because we concluded that the District Court's

_____

6. Note that Amendment 591 was not yet ef fective when we heard oral argument in this appeal on September 14, 2000. If our opinion had been issued before November 1, 2000, the above discussion of the effect of the Amendment would not be necessary.

9

decision to sentence under the money laundering guideline was appropriate either under the amended guidelines or under the Smith framework. By contrast, because the Smith approach may produce a differ ent result than will the amended guidelines in the instant case, the issue of retroactivity is squarely befor e us for resolution. To answer this question, we must compare the sentencing approach under Smith with the approach r equired under the amended guidelines. Smith, like the pr esent case involved multiple counts of conviction; in Smith, embezzlement and money laundering. As we note above, S 3D1.3 pr ovides that in a group of closely related counts, the offense level applicable to the group is that of the count with the highest offense level. The applicable offense level is found by referring to the Statutory Index (Appendix A).

In Smith, we instructed the District Court to consult Appendix A for a list of guidelines that corr espond to the statute of conviction (the count with the highest of fense level, i.e., money laundering). The Intr oduction to the Statutory Index (Appendix A) provided, however , that, if " `in an atypical case' the guideline indicated for the statute of conviction is `inappropriate because of the particular conduct involved,' the court is instructed to use the guideline `most applicable to the nature of the offense conduct charged.' " Smith, 186 F .3d at 297 (quoting U.S. Sentencing Manual App. A at 417 (Introduction)); see U.S. Sentencing Manual app. A Intro. at 425 (1998). We concluded that the guidelines required the sentencing court to perform a heartland analysis in making the initial choice of the appropriate guideline to apply in or der to determine whether the conduct being punished falls within a set of typical cases embodying the conduct described in each guideline.[7] See id. at 297–98 (citations and internal quotation marks omitted); see also Koon v. United States, 518 U.S. 81, 94 (1996) (discussing heartland analysis and the power of district courts in imposing sentence to consider circumstances not considered by the Sentencing Commission in creating the guidelines). W e created a two-

_____

7. This heartland analysis was identical to that performed in the context of a request for a departure from the guidelines. See Smith, 186 F.3d at 298.

step approach, with a court first deciding whether the conduct is "atypical" of the conduct usually punished under the statute of conviction (money laundering) and, second, if it is atypical, determining what other guideline would be more appropriate for sentencing. See Smith, 186 F.3d at 297 (citing United States v. V oss, 956 F.2d 1007, 1009 (10th Cir. 1992)).

Amendment 591 changed U.S.S.G. SS 1B1.1 and 1B1.2, the Application Note to S 1B1.2, and the Intr oduction to the Statutory Index (Appendix A), and in doing so, appar ently abrogates the Smith analysis. See Mustafa, 238 F.3d at 496 (suggesting, but not deciding, that "the continued relevance of Smith is open to question"). Section 1B1.1(a) was amended to delete language providing that the Statutory Index (Appendix A) "provides a listing to assist" in determining the applicable offense guideline. See U.S. Sentencing Manual app. C at 29 (Supp. 2000).8 Section 1B1.2(a) was amended to replace the phrase"most applicable" with "applicable" in instructing courts to determine the guideline to be applied to the offense of conviction. See U.S. Sentencing Manual app. C at 29 (Supp. 2000).9 The Amendment also deleted language in Application Note 1 to S 1B1.2 providing that, "as a general rule," the sentencing court was to use the guideline "most applicable" to the offense of conviction and that the Statutory Index (Appendix A) would "assist" in this determination. See U.S. Sentencing Manual S 1B1.2, Application Note 1, at 16 (1998). The new Application Note unequivocally provides that the "court is to use" the guideline provided in the Statutory Index (Appendix A) for

_____

8. Compare U.S.S.G. S 1B1.1(a) (1998) ("Determine the applicable offense guideline section from Chapter Two. . . . The Statutory Index (Appendix A) provides a listing to assist in this determination.") (emphasis added) with U.S.S.G. S 1B1.1(a) (2000) ("Deter mine, . . . the offense guideline section from Chapter Two (Offense Conduct) applicable to the offense of conviction.").

9. Compare U.S.S.G. S 1B1.2(a) (1998) ("Determine the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction[.]") (emphasis added) with U.S.S.G. S 1B1.2(a) (2000) ("Determine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction[.]") (emphasis added).

11

the offense of conviction. See U.S. Sentencing Manual S 1B1.2, Application Note 1, at 16 (2000); see also U.S. Sentencing Manual app. C at 30 (Supp. 2000) (explaining changes to Application Note). Finally, and most importantly, Amendment 591 removed from the Intr oduction to the Statutory Index (Appendix A) the language on which we relied in Smith, 186 F.3d at 297, instructing courts to, "in an atypical case," where "the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted." See U.S. Sentencing Manual app. A Intro. at 425 (1998); see also U.S. Sentencing Manual app. C at 30-31 (Supp. 2000) (describing changes to Statutory Index).

The amendment reflects a change from the permissive to the mandatory. The sentencing court no longer uses the Statutory Index (Appendix A) as an aid in finding the most applicable guideline among several possibilities; the Statutory Index (Appendix A) now conclusively points the court to the one guideline applicable in a given case.

The Sentencing Commission specifically cited Smith in explaining that the Amendment was intended, in part, to overturn case law which permitted the courts in multiple count cases to select a guideline based on factors other than the conduct charged in the offense of conviction which carries the highest offense level. See U.S. Sentencing Manual app. C at 31 (Supp. 2000). The Amendment sought "to emphasize that the sentencing court must apply the offense guideline referenced in the Statutory Index for the statute of conviction," unless the case falls within a narrow exception not applicable to the instant case. See U.S. Sentencing Manual app. C at 32 (Supp. 2000) (emphasis added). The Commission particularly noted that some courts had declined to use the offense guidelines referenced in the Statutory Index (Appendix A) in cases that were atypical or outside the heartland of a guideline, again citing Smith. See U.S. Sentencing Manual app. C at 32 (Supp. 2000).

The only fair reading of the Amendment and of the amended guidelines is that Smith, and its approach to

12

applying the guidelines, is no longer good law. In cases, such as the instant one, in which several counts, including fraud and money laundering, have been grouped pursuant to U.S.S.G. S 3D1.2(b), the count carrying the highest applicable offense level must apply to the entire group for sentencing purposes. See U.S.S.G. SS 3D1.3(a), 3D1.4; see also Smith, 186 F.3d at 297. Under the guidelines as amended, sentencing courts may not conduct an inquiry into the heartland of S 2S1.2 and courts have no discretion to decide that the money laundering guideline is inappropriate or not the most applicable guideline on the facts of a given case.

A post-sentencing amendment to a guideline, or to its comments, should be given retroactive ef fect only if the amendment "clarifies" the guideline or comment in place at the time of sentencing; the amendment may not be given retroactive effect if it effects a substantive change in the law. See Marmolejos, 140 F.3d at 490.

Although there is no bright line for distinguishing between a substantive and clarifying amendment, we have suggested that courts should look to the language of the amendment, its purpose and effect, and whether the guideline and commentary in effect at the time of sentencing is consistent with the amended sentencing manual. See id. at 491; United States v. Bertoli, 40 F.3d 1384, 1405 (3d Cir. 1994). Generally, if the amended guideline and commentary overrules a prior judicial construction of the guidelines, it is substantive; if it confirms our prior reading of the guidelines and does not disturb prior precedent, it is clarifying. See id. This analysis may also implicate constitutional concerns because the retroactive application of a sentencing pr ovision will violate the Constitution's prohibition against ex post facto laws, see U.S. Const. art. I, S 9, cl. 3, when such application would "disadvantage" the defendant affected by it. See United States v. Bogusz, 43 F.3d 82, 93 (3d Cir. 1994); Bertoli, 40 F.3d at 1405; Menon, 24 F.3d at 566.

With this standard and the contours of the pre-amendment and amended guidelines in mind, it is clear that Amendment 591 effects a substantive change to the Sentencing Guidelines as we interpreted them in Smith. For

13

that reason, it cannot be applied retroactively to Diaz's sentence. The amendment plainly abrogates and overrules our prior construction of the guidelines in Smith and its progeny. The Sentencing Commission explicitly cited Smith as a court decision improperly choosing a guideline based on considerations other than the statute of conviction, strongly suggesting that the very purpose of the amendment was to eliminate Smith. The amendment deleted language from the Introduction to the Statutory Index (Appendix A) on which we relied for our approach.

The amendment also alters courts' actual practice in sentencing. Smith and its progeny were in agreement that the guidelines required a sentencing court to conduct a heartland analysis in selecting the most appropriate guideline for sentencing in the first instance, considering whether the conduct at issue is "atypical;" if the court concluded that the conduct was atypical or anomalous, it was to sentence under a more appropriate guideline. See Bockius, 228 F.3d at 311–12; Smith, 186 F.3d at 297. Thus, conduct outside the heartland of money laundering was to be sentenced under a different guideline, such as the fraud guideline. See Smith, 186 F.3d at 300 (holding that sentence in anomalous case of money laundering and fraud should be under fraud guideline, rather than money laundering guideline).[10]

Retroactive application raises ex post facto problems in the instant case because Diaz potentially would be disadvantaged by such retroactivity. Under Smith and its progeny, Diaz could have been sentenced under the fraud guideline rather than the money laundering guideline, resulting in a sentence of 6–12 fewer months in prison, were a court to find that her primary offense conduct was fraud, with money laundering only a minor, incidental part of that overall conduct. See infra Part III.B. She therefore

---

10. The only difference in the later cases applying Smith was our determination of the contours of the heartland of the money laundering guidelines and our conclusion in those cases that the conduct at issue was, in fact, within the heartland of money laundering. See Bockius, 228 F.3d at 313 (holding that conduct at issue constitutes typical money laundering and therefore was in the heartland of that guideline for sentencing purposes); Cefaratti, 221 F.3d at 514–15 (same).

14

may be entitled to be resentenced under S 2F1.1, depending on the facts of her case and whether or not her conduct falls within the heartland of money laundering. See infra Part III.C. On the other hand, under the guidelines as amended, no heartland analysis is necessary or pr oper and Diaz would not have an opportunity to receive the lesser sentence; she must be sentenced under the money laundering guideline and we would be compelled to affirm her sentence without further analysis. The Constitution does not, however, permit retr oactive application of an amended sentencing guideline where, as her e, a harsher penalty might result. See Menon, 24 F .3d at 566.

Nevertheless, the Government argues that the Amendment is clarifying and therefore capable of retroactive application. It points to the Sentencing Commission's characterization of the Amendment as intended to "clarify" the inter-r elationship among SS 1B1.1 and 1B1.2 and the Statutory Index (Appendix A) and as being a "clarification" intended to "emphasize that the sentencing court must apply the offense guideline referenced in the Statutory Index." See U.S. Sentencing Manual app. C at 31-32 (Supp. 2000). The Sentencing Commission's characterization of an amendment as "clarifying" is not, however, binding on us, nor even entitled to substantial weight. See Bertoli, 40 F .3d at 1407 n.21 (citing Menon, 24 F.3d at 567); see also Marmolejos, 140 F.3d at 493 ("[T]he mere fact that an amendment is referred to as a clarification or a revision is or dinarily of slight import to our analysis."). Rather, it is our own interpretation of the pre-amendment guidelines that determines whether the Amendment clarified that interpretation or substantively changed it. See Marmolejos, 140 F.3d at 493; Bertoli, 40 F .3d at 1407 n.21.

Moreover, a "clarifying" amendment cannot be used to interpret an earlier guideline when the r esult would be to punish the defendant more harshly, as might be the case here. See Menon, 24 F.3d at 567. Thus, the Commission's characterization of Amendment 591 does not af fect our conclusion that the Amendment is, in fact, substantive and incapable of retroactive application. For the same reason, we disapprove the decision from the Middle District of

15

Pennsylvania in United States v. Bifield, 124 F. Supp. 2d 307, 311 (M.D. Pa. 2000), in which the court held that Amendment 591 was clarifying, based on nothing mor e than acceptance of the Sentencing Commission's characterization of the Amendment as such.

Our independent interpretation and analysis of Amendment 591 establishes that it substantively changed the sentencing guidelines as we interpreted them in Smith and its progeny and its application in the instant case would raise ex post facto problems. The amended guidelines cannot constitutionally be applied to Diaz's sentence. We therefore will apply the pre-amendment guidelines, meaning the analysis established in Smith and its progeny, to the instant case.

B

We turn now to the application of the pre-amendment guidelines, as we interpreted them in Smith and its progeny. The Smith approach r equires that we conduct a heartland analysis of the money laundering guidelines, determine whether Diaz's conduct is atypical of cases ordinarily sentenced under that guideline, and, if so, determine what guideline would be more appropriate given her offense conduct. There are several decisions from this Circuit, involving convictions for both fraud and money laundering, that affect our analysis.

In Smith, we first suggested that District Courts should not automatically apply the money laundering guideline to a group of offenses that includes a money laundering charge, where the overall conduct is not in the heartland of the money laundering guideline and its application "obscures the overarching directive to match the guideline to the offense conduct which formed the basis of the underlying conviction." Smith, 186 F .3d at 300. In Smith, the defendants were convicted of four of fenses: conspiracy to defraud, interstate transportation of stolen pr operty, causing unlawful interstate transportation with intent to distribute stolen property, and money laundering under 18 U.S.C. S 1956. See id. at 296-97. In the embezzlement-and-kickback scheme at work in Smith, the money laundering

16

was based on the fact that defendant Dandrea wr ote out checks on the proceeds of kickbacks and defendant Smith ordered that many of these checks be made payable to his creditors rather than directly to Smith. See id. at 300. The District Court grouped the four offenses and calculated the sentence under S 2S1.1, the guideline applicable to the money laundering count.

On appeal, we vacated the sentences of both defendants and remanded for resentencing under the fraud guideline, rather than the money laundering guideline. See id. at 300. We relied on a 1997 report to Congr ess by the Sentencing Commission, in which the Commission stated that the high base offense levels for money laundering r eflected an effort to punish the activities which aroused Congr essional concern: "1) situations in which the `laundered' funds derived from serious underlying criminal conduct such as a significant drug trafficking operation or or ganized crime; and, 2) situations in which the financial transaction was separate from the underlying crime and was undertaken to either: a) make it appear that the funds wer e legitimate, or b) promote additional criminal conduct by r einvesting the funds in additional criminal conduct." Smith , 186 F.3d at 298 (quoting United States Sentencing Commission, Report to Congress: Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report 4 (1997) [hereinafter "Report to Congress"]). This type of conduct, then, was the heartland of the money laundering guidelines.

We also noted that the money laundering guideline had been roundly criticized by judges concer ned with the unwarranted harshness of sentences imposed under the money laundering guideline in particular cases and that judges routinely granted downward departur es to avoid such harsh results. See Smith, 186 F .3d at 298-99. The Commission in 1995 proposed amendments to the money laundering guideline, designed to provide penalties more proportionate to " `both the seriousness of the underlying criminal conduct' and to `the nature and seriousness of the laundering conduct itself.' " Id. at 299 (quoting United States v. Woods, 159 F.3d1132, 1135 (8th Cir. 1998)). But the amendments were not approved by Congr ess. The

17

House Judiciary Committee did acknowledge, however , that "the application of the current guidelines to receipt-and-deposit cases, as well as to certain other cases that do not involve aggravated money laundering activity, may be problematic." See id. at 299 (quoting H.R. Rep. 104-272, at 14-15, reprinted in 1995 U.S.C.C.A.N. 335, 348-49) (internal quotation marks and emphasis in Smith omitted). However, "past sentencing anomalies arising from relatively few cases do not justify a sweeping downward adjustment in the money laundering guidelines." See Smith, 186 F.3d at 299 (quoting H.R. Rep. 104-272, at 15, r eprinted in 1995 U.S.C.C.A.N. at 349) (internal quotation marks and emphasis in Smith omitted)). To do otherwise, the Committee suggested, would send the dangerous message that money laundering associated with drug and other serious crimes was not viewed as a grave offense. See Smith, 186 F.3d at 299 (quoting H.R. Rep. 104-272, at 15, reprinted in 1995 U.S.C.C.A.N. at 349).

We concluded that Congress intended that those "anomalies" should be controlled by the courts. See Smith, 186 F.3d at 299. And the courts should deal with such cases fairly, not with a strict focus on the technicalities of sentencing, but with an eye towards matching the guideline to the underlying criminal conduct. See id. at 300 (quoting United States v. Kuko, 129 F.3d 1435, 1440 (11th Cir. 1997)). To apply the money laundering guideline in a routine fraud case would be, we held, to "let the `tail wag the dog.' " See Smith, 186 F.3d at 300. In Smith, we decided that the money laundering guideline was inappr opriate because the defendants left a paper trail, conduct inconsistent with concealment, because any ef forts at concealment were disingenuous, and because, when evaluated against the entire course of conduct, the money laundering was an incidental by-product of r outine fraud. See id. The overall conduct at issue was not in the heartland of the money laundering guideline and that guideline was not to be used in sentencing.

Our first opportunity to apply Smith came several months ago in the case involving Diaz's brother, Frank Cefaratti,11

_____

11. Cefaratti was charged separately fr om his sister, Diaz, and the other parties involved in the criminal conduct. He was indicted on 27 counts

18

and his role in the same scheme to fraudulently obtain student financial assistance funds on behalf of the Franklin School. Cefaratti was sentenced under the money laundering guideline but argued on appeal that, under Smith, he should have been sentenced under the fraud guideline.[12] We affir med the sentence, rejecting Cefaratti's suggestion that Smith had limited the money laundering guideline only to large-scale drug trafficking and organized crime. See Cefaratti, 221 F.3d at 513. In particular, we noted that, in numerous pre-Smith decisions, we did not question the propriety of sentencing under the money laundering guideline in cases involving both a scheme to defraud and the laundering of the proceeds of that scheme. See id. (citing cases). We held that the Smith court "gave no indication that it intended a radical departur e from this precedent." Id. Rather, we interpreted Smith as requiring use of the fraud guideline where the money laundering, although technically a violation of the statute, was merely an "incidental by product" of otherwise r outine fraud. See id. at 514 (citing Smith, 186 F.3d at 300).

In particular, Cefaratti clarified a key point underlying our decision in Smith: that the Sentencing Commission in its report to Congress had suggested that the heartland of money laundering included not only the proceeds of serious drug trafficking and organized crime but also situations in which separate financial transactions were undertaken either to legitimize illegally obtained funds or to promote additional criminal conduct. See Cefaratti, 221 F.3d at 514 (citing Smith, 186 F.3d at 298 (citing, in turn, Report to

_____

in September 1998. In October 1998 he entered a plea agreement in which he pled guilty to four counts, including one count of mail fraud, one count of student loan fraud, one count of destruction of property to prevent seizure, and one count of money laundering under S 1957. He pled guilty in October 1998 and was sentenced in 1999, inter alia, to 51 months in prison and ordered to pay r estitution in the amount of $846,000, the DOE's full loss. See Cefaratti, 221 F.3d at 504.

12. Unlike Diaz in the instant case, Cefaratti did not object to the use of the money laundering guideline before the District Court. Therefore we reviewed his sentence under the plain err or standard. See Cefaratti, 221 F.3d at 512 (citing United States v. Knobloch, 131 F.3d 366, 370 (3d Cir. 1997)).

19

Congress at 4)). Therefore, the heartland of U.S.S.G. S 2S1.2 included separate monetary transactions designed to conceal past criminal conduct or to promote further criminal conduct.

The evidence in that case demonstrated that Cefaratti reinvested the proceeds of the mail and wire fraud in the school and therefore used the proceeds to continue the fraud. He continued the operation of the school, which only survived by receiving 90 percent of its r evenue from student financial assistance program funds. See Cefaratti, 221 F.3d at 514–15. The continued operation of the school enabled it to receive Pell and Stafford funds to which it was not entitled after February 1996 (the point at which the 1993 default rate was calculated). This was differ ent than Smith, which involved only routine fraud and the r eceipt, deposit, and use of the proceeds of that fraud without serious attempts to fund further criminal activity.

A short time later, in Bockius, we held that the District Court erred in sentencing the defendant under the fraud guideline rather than the money laundering guideline. The defendant there stole more than $600,000 from an insurance brokerage firm, wired it to several accounts, converted the money to cash, gambled some of it away, then went to the Cayman Islands with the remainder. Once there, he formed a corporation and bought a house in the name of the corporation using some of the cash. He planned to deposit the remainder in dif ferent banks in deposits of less than $10,000 in order to avoid reporting requirements. See Bockius, 228 F .3d at 307–08. Instead, he formed a partnership with another individual, who in turn stole the remainder of the money from the defendant. See id. at 308. The defendant pled guilty to, inter alia, wire fraud and money laundering under 18 U.S.C. S 1956. His initial sentence, calculated under S 2S1.1, was vacated; on resentencing, the District Court sentenced him under S 2F1.1. The court read Smith as limiting the money laundering guideline only to drugs and serious, meaning organized, crime, not the kind of conduct at issue in that case. See id. at 309.

We reversed, holding that the District Court had misinterpreted Smith. We r ecognized that there was

20

language at one point in the Smith decision to support the narrow reading urged by the defendant;13 we held, however, that Smith makes clear that the heartland of money laundering also includes "typical money laundering in which a defendant knowingly conducted a financial transaction to conceal tainted funds or funnel them into additional criminal conduct." Bockius, 228 F.3d at 312 (citing Smith, 186 F.3d at 298). Further review of the comments by the Sentencing Commission and Congr ess, discussed in Smith, reinforced our view that "S 2S1.1 is intended to apply to defendants who knowingly conduct financial transactions apart from an underlying criminal offense to conceal that the proceeds involved are tainted. We held no differently in Smith." Bockius, 228 F.3d at 311. We also pointed to cases from other cir cuits supporting the proposition that, while the heartland of the money laundering guideline is narrower than the money laundering statute, its scope is not limited only to drug trafficking and organized crime. See id. at 312–13 (citing cases). The defendant in Bockius acknowledged engaging in several separate acts designed to conceal the illegal source of the money and his ownership of it, including multiple wire transfers, conversion of the funds to cash, deposits in multiple bank accounts in amounts small enough to avoid reporting requirements, formation of a corporate fiction, and placement of the funds in a partnership with another individual. See id. at 313. We r emanded for the District Court to determine whether these actions constituted typical money laundering so as to fall within the heartland of the money laundering guideline.

Most recently, in Mustafa, we held that the District Court had not committed plain error in sentencing a defendant to 135 months imprisonment, applying S 2S1.1, where the defendant had pled guilty to, inter alia, 40 counts of money

_____

13. The defendant and the District Court r elied on the following language:

> Ultimately, we conclude that the Sentencing Commission itself has indicated that the heartland of U.S.S.G. S 2S1.1 is the money laundering activity connected with extensive drug trafficking and serious crime. Smith 186 F.3d at 300.

21

laundering, as well as counts of mail fraud, food stamp fraud, and making false statements in obtaining a bank loan. See Mustafa, 238 F.3d at 488. The defendant had deposited more than $1.5 million worth of fraudulently obtained food stamps in a bank account. See id. We discussed at length our prior circuit case law and recognized that the conduct involved was less akin to traditional notions of money laundering than the conduct at issue in Bockius. See id. at 495. Nevertheless, we held that the deposits were intended to disguise the source and nature of the proceeds and to create an appearance of their legitimacy, making sentencing under S 2S1.1 appropriate. See id. The deposits, necessary to give the food stamps any value, were intended to effectuate the concealment of the original source of those funds. See id. at 495-96.

The United States in its briefs relies on another case, United States v. Morelli, 169 F.3d 798 (3d Cir. 1999), decided several months prior to Smith. The United States believes Morelli is significant because we stated, in dictum, that the proposed, but disapproved, amendments to the Sentencing Guidelines did not provide independent legal authority for a downward departure. See Morelli, 169 F.3d at 809 n.13. We rejected the defendant's arguments because the defendant was challenging the District Court's exercise of its discretion in denying a downward departure, a claim that we were without jurisdiction to consider. See id.; see also United States v. Khalil, 132 F.3d 897, 898 (3d Cir. 1997) (holding that there was no jurisdiction on appeal to review a discretionary downward departure). Morelli involved a scheme to avoid the payment of excise taxes on the sale of certain fuels. The defendants or ganized a group of companies into a "daisy chain," in which oil would be sold down the chain in a series of paper transactions, sold by the company at the bottom of the chain to a legitimate retailer, and the money sent back up the chain in a series of wire transfers, with one of the companies, the so-called "burn company," collecting the taxes, then disappearing. See Morelli, 169 F.3d at 803. W e held that the tax money was the proceeds of the entire ongoing wir e fraud venture, consisting of all the individual series of transactions. See id. at 806. The entire program constituted one large, ongoing wire fraud scheme and each wiring up and down

22

the chain furthered the execution of each individual act of tax fraud. See id. at 806-07. Therefor e, the money gained in each series of transactions (except the first one) was the proceeds of wire fraud, because it was pr oceeds of a fraud furthered by the prior wire transfers. See id. at 807. Thus, there was sufficient evidence to convict the defendant of money laundering and to sentence him under the money laundering guideline. See id. at 809.

C

We now must apply those legal principles to the instant case. In doing so, and in exercising plenary r eview, we conclude that Diaz should have been sentenced under the fraud guideline and she therefore is entitled to a new sentencing hearing.

We first reject the government's contention that Morelli controls or even is relevant to the instant case. The issue that we addressed in Morelli was whether the government had presented sufficient evidence to support a conviction for money laundering and therefore to support use of the money laundering guideline in sentencing; we concluded that it indeed had presented sufficient evidence. See Morelli, 169 F.3d at 809. We did not addr ess the issue of whether that conduct was typical, or in the heartland, of the money laundering guideline for sentencing purposes. In fact, we could not analyze that issue at all because the defendant was challenging the District Court's exercise of its discretion in declining to depart downwar d, a decision that we did not have jurisdiction to review. See id. at 809 n.13. By contrast, the precise question presented in the instant case is whether the District Court erred in its initial choice of guideline, a question that we do have jurisdiction to consider and resolve.

We also reject, as we did in Mustafa , Bockius, and Cefaratti, a reading of Smith that would limit the use of the money laundering guidelines, U.S.S.G. SS 2S1.1 and 2S1.2,[14]

_____

14. U.S.S.G. S 2S1.1 is the guideline applicable to money laundering convictions under 18 U.S.C. S 1956; U.S.S.G.S 2S1.2 is the guideline applicable to money laundering convictions under 18 U.S.C. S 1957. Smith, Bockius, and Mustafa involved convictions under S 1956 and sentencing under S 2S1.1; Cefaratti and the instant case involve convictions under S 1957 and sentencing underS 2S1.2.

23

only to cases involving the proceeds of lar ge-scale drug trafficking and organized crime. See Bockius, 228 F.3d at 309; Cefaratti, 221 F.3d at 513. Rather, Mustafa, Bockius, Cefaratti, and Smith all are in accord that the heartland of the money laundering guidelines includes, in addition to drugs and organized crime, cases involving typical money laundering, financial transactions that ar e separate from the underlying crime and that are designed either to make illegally obtained funds appear legitimate, to conceal the source of some funds, or to promote additional criminal conduct by reinvesting the funds in additional criminal conduct. See Mustafa, 238 F.3d at 495; Bockius, 228 F.3d at 312; Cefaratti, 221 F.3d at 514; Smith, 186 F.3d at 298.

However, in those cases not governed by the Sentencing Guidelines as amended in November 2000, the money laundering guidelines are not applicable to or dinary cases of routine fraud, to the simple receipt and deposit or use of illegally obtained funds, or to cases in which any money laundering is not separate from the underlying fraud, but merely an "incidental by product" of that underlying fraud. See Mustafa, 238 F.3d at 494-95; Bockius, 228 F.3d at 311; Cefaratti, 221 F.3d at 514; Smith, 186 F.3d at 300. Sentencing under the money laundering guidelines is not appropriate in cases in which the money laundering is minimal when evaluated against the overall of fense conduct. See Bockius, 228 F.3d at 313; Cefaratti, 221 F.3d at 515; Smith, 186 F.3d at 300.

We conclude that where the defendant has not made a serious, concerted effort to conceal or to legitimize the funds or to reinvest them in additional criminal activity, it is not appropriate to sentence that defendant under the money laundering guideline. Congress and the Sentencing Commission considered such cases anomalous fr om the standpoint of S 2S1.2 and left it to the courts to deal with such atypical cases fairly, by focusing not on the strict technicalities of the sentencing process, but on matching the appropriate guideline to the nature of the offense conduct. See Smith, 186 F.3d at 300. We believe that sentencing in such cases is more appropriately controlled by the guideline applicable to the underlying criminal conduct, such as fraud.

24

We agree with the application of this legal standard to the facts in Cefaratti, Bockius, and Mustafa and our conclusion in all three cases that money laundering was the appropriate guideline. The evidence showed that Cefaratti received federal student financial assistance funds on behalf of the Franklin School after February 1996, when, but for the fraud, the school probably would have been terminated from the Pell and Staf ford programs. Cefaratti used the fraudulently derived proceeds to pr omote further fraud, by continuing to receive federal funds to operate the school after it otherwise would have been shut down, including building an addition to the school with the federal funds and making payments to some lenders so it would appear that students were not in default. See Cefaratti, 221 F.3d at 215. Such conduct was not incidental to or a minimal aspect of the underlying fraud.

Similarly, the defendant in Bockius admitted that he engaged in several acts designed to conceal the illegal source of the money and his ownership and possession of it, including multiple wire transfers, conversion to cash, and deposits of small amounts of money in multiple bank accounts. See Bockius, 228 F.3d at 307–08, 313. We agree that such typical money laundering, designed to conceal the source of, and thereby legitimize, the funds is within the heartland of the guideline. In the same way, in Mustafa the defendant's deposits of food stamps "wer e intended to disguise the source and nature of the pr oceeds of his fraudulent activity" and to "effectuate" concealment of that original source. See Mustafa, 238 F .3d at 495–96.

We believe, however, that under the facts of the instant case, the District Court erred in sentencing Diaz under the money laundering guideline rather than under the fraud guideline. The instant case demonstrates how dif ferent situations, even those involving the participants in the same criminal conduct, may require dif ferent results. Diaz never used the proceeds of her fraudulent activities to promote additional criminal conduct by r einvesting in further criminal conduct. The Franklin School was a legitimate enterprise during the period from 1992 and July 1994, when Diaz submitted false forbearance and deferment forms. The 1993 default rate had not been

25

calculated during this time; therefore, the school was not yet subject to termination from the financial assistance programs, even absent Diaz's fraud. When Diaz transferred the Pell Grant and Stafford loan funds into the school's account, that monetary transaction maintained and promoted a legitimate enterprise, not further criminal conduct. We deal with a simple receipt-and-deposit case to which S 2S1.2 should not apply. Diaz made no efforts to disguise the source of the student assistance funds that the Franklin School received and deposited or to conceal the fact that the deposits were federal student assistance funds.

Diaz did violate S 1957(a) because she engaged in a monetary transaction in criminally derived pr operty: She transferred funds, derived from fraud, into the school's account. See 18 U.S.C. S 1957(a) (making it illegal to "knowingly engage[ ] . . . in a monetary transaction in criminally derived property . . . derived fr om specified unlawful activity"). Having engaged in the fraud, Diaz used the proceeds to cover school expenses. Of course, the purpose of fraud, in almost all cases, is to obtain money or other property and to put it to some use. AS 1957(a) violation almost always will accompany the commission of such routine fraud. The deposit of the student assistance funds in the instant case accompanied the fraud that was used to obtain those funds; the deposits should not be viewed as separate from the underlying fraud, but as an inseparable and incidental by-product of that fraud. To sentence under S 2S1.2 in a case such as this one would indeed allow the money laundering guideline to swallow whole the fraud guideline or, as we said in Smith, "let the `tail wag the dog.' " See Smith, 186 F.3d at 300.

The deposit of the funds also was minimal when evaluated against the totality of Diaz's unlawful conduct. At its heart, Diaz's offense conduct consisted of the preparation and submission of fraudulent defer ment and forbearance documents and submission of fraudulent student loan applications. This is a clear example of routine fraud. Any proceeds that were deposited prior to July 1994 (the point at which Diaz stopped her involvement in the school) represented a small part of her conduct and a small

percentage of the moneys obtained from the DOE by the fraud. Diaz's fraud therefore is the appr opriate conduct to be considered for sentencing purposes and it should provide the guideline under which she should be sentenced.

We believe that this is the anomalous case that Congress and the Sentencing Commission found "problematic," see Smith, 186 F.3d at 298 (quoting H.R. Rep. 104-272, at 14-15, reprinted in 1995 U.S.C.C.A.N. 335m 347-49), at least under the law prior to the amendments to the Statutory Index-Appendix A. Diaz's conduct, although a violation of S 1957(a), is atypical and therefor e not in the heartland of S 2S1.2, as we understood and applied that guideline prior to the recent amendments. Under these facts, she should not be subject to punishment under the higher guideline. We therefore will vacate Diaz's sentence and remand for resentencing pursuant to U.S.S.G. S 2F1.1.

IV. RESTITUTION

Diaz also challenges the order to pay r estitution of $846,000, the full amount of the DOE's loss, less any amounts Diaz could show had been paid. Diaz ar gues that Cefaratti also was made to pay the full amount in restitution and that two other people convicted in this scheme each were ordered to pay $1,000 in restitution. Diaz suggests that the District Court therefor e might have ordered restitution in an amount gr eater than the actual loss, which it cannot do. See United States v. Gottlieb, 140 F.3d 865, 873-74 (10th Cir. 1998) (citation omitted). This objection was not raised below and we review only for plain error. Cefaratti, 221 F.3d at 512, Knobloch, 131 F.3d at 370; see also United States v. Thompson, 113 F.3d 13, 15 (2d Cir. 1997) (holding that improperly ordered restitution constitutes an illegal sentence amounting to plain error).

The purpose of restitution under the MVRA is to compensate the victim for its losses and, to the extent possible, to make the victim whole. See United States v. Kress, 944 F.2d 155, 159-60 (3d Cir. 1991). It follows, therefore, that a District Court cannot or der multiple defendants to pay restitution in amounts that will result in the payment to the victim of an amount greater than the

27

victim's loss. See Gottlieb, 140 F.3d at 873-74. A District Court may, however, impose joint and several liability on multiple defendants for restitution, per mitting the victim to recover its losses from all or some of the wrongdoers. See United States v. Hunter, 52 F.3d 489, 494-95 (3d Cir. 1995). It appears that is what the District Court did, or intended to do, in the instant case. We therefor e affirm the order of restitution and the amount to be paid by Diaz. However, on remand, the lower court should clarify that the restitution obligations of Diaz, Cefaratti, and the other people involved in this scheme are joint and several.

V. CONCLUSION

For the foregoing reasons, Diaz's sentence is vacated and this matter is remanded for resentencing under the fraud guideline, U.S.S.G. S 2F1.1. The order of restitution is affirmed, although on resentencing the District Court shall clarify that Diaz's liability is joint and several.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

28